**v.**

**Renee A. FOOSE, et al., Defendants.**

**CIVIL NO. JKB–14–4014**

United States District Court,
D. Maryland.

Signed December 7, 2015

---

## *MEMORANDUM*

James K. Bredar, United States District Judge

J.M. and B.M. ("the Father" and "the Mother" or "the Parents") and M.M., a disabled minor student, by and through his Parents (collectively, "Plaintiffs"), brought suit against Renee A. Foose in her official capacity as Superintendent of Howard County Public Schools ("HCPS" or "the School System") and against the Howard County Board of Education (collectively, "Defendants"). Plaintiffs allege that Defendants denied M.M. the free appropriate public education ("FAPE") to which he is entitled under the Individuals with Disabilities Education Act ("the IDEA"), as amended, 20 U.S.C. §§ 1400 *et seq.,* and its Maryland corollary, Md.Code Ann., Educ. §§ 8–401 *et seq.*

Plaintiffs previously filed a due process complaint with the Maryland Office of Administrative Hearings ("OAH"), seeking tuition reimbursement and placement of M.M. at the nonpublic St. Elizabeth School in Baltimore City ("St.Elizabeth"). In an October 22, 2014, Order, Administrative Law Judge ("ALJ") Marc Nachman denied Plaintiffs' requested relief. (ALJ Decision at 88.[1]) Plaintiffs thereafter filed this action, seeking (1) a declaratory judgment that Defendants have violated Plaintiffs' rights; (2) an injunction vacating the prior decision of ALJ Nachman and requiring Defendants to reimburse Plaintiffs for the cost of enrolling M.M. at St. Elizabeth in 2013–14;[2] and (3) an order requiring Defendants to recognize St. Elizabeth as M.M.'s current placement under the IDEA. (ECF No. 1 at 17–18.)

Now pending before the Court are cross-motions for summary judgment filed by Plaintiffs (ECF No. 12) and Defendants (ECF No. 14). The issues have been briefed (ECF Nos. 12–1, 14–1, 17 & 20), and no hearing is required, Local Rule 105.6 (D.Md.2014). For the reasons explained below, Defendants' Motion will be GRANTED, and Plaintiffs' Motion will be DENIED.

## I. *The IDEA's FAPE Requirement*

In enacting the IDEA, Congress recognized that disability is a "natural part of the human experience" and that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). The IDEA provides federal funding for states that develop policies and

---

1. ALJ Nachman's Decision is not accessible on the Court's CM/ECF electronic docketing system but was instead submitted as part of a lengthy administrative record filed in paper form under seal. The Court will refer to exhibits within this record using the nomenclature established by the parties in the administrative proceedings below: Defendants' exhibits will be referenced as "Board_# " and Plaintiffs' exhibits will be referenced as "MM_#."

2. M.M. began attending St. Elizabeth on January 21, 2014 (MM_74); consequently, any tuition reimbursement would be calculated from that date forward.

procedures to ensure that each child has access to a FAPE. § 1412(a). The State of Maryland has implemented such policies and procedures. *See* Md.Code Ann., Educ. §§ 8–401 *et seq.*; Md.Code Regs. 13A.05.01.01 *et seq.*

A FAPE must provide a "basic floor of opportunity" for disabled children, consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit" to such children. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rowley's "educational benefit" requirement will "not be met by the provision of de minimis, trivial learning opportunities." *Reusch v. Fountain*, 872 F.Supp. 1421, 1425 (D.Md.1994). Even so, the IDEA does not "require a school district to provide a disabled child with the best possible education." *MM ex rel. DM v. Sch. Dist.*, 303 F.3d 523, 526 (4th Cir.2002); *see also O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015) ("In this circuit, the standard remains the same as it has been for decades: a school provides a FAPE so long as a child receives some educational benefit, meaning a benefit that is more than minimal or trivial, from special instruction and services."); *Hessler v. State Bd. of Educ.*, 700 F.2d 134, 139 (4th Cir.1983) (rejecting the premise that states are obligated to provide students with the "best education, public or nonpublic, that money can buy," and further denying the proposition that "because a given school is allegedly more appropriate than another school, the less appropriate school becomes inappropriate").

Moreover, while the IDEA does contemplate that some disabled students may require services in specialized, nonpublic settings, the statute imposes a Least Restrictive Environment ("LRE") requirement: "To the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes ... cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); *see also DeVries ex rel. DeBlaay v. Fairfax Cty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989) ("Mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act.").

So as to ensure that each child receives a FAPE, school officials must create an individualized education plan ("IEP") for any child with a disability. 20 U.S.C. § 1412(a)(4); Md.Code Regs. 13A.05.01.09. The IEP must take into account, *inter alia*, the strengths of the child; the concerns of the child's parents; the results of evaluations; and the academic, developmental, and functional needs of the child. 20 U.S.C. § 1414(d)(3)(A). Parents who are dissatisfied with their child's IEP may complain to school officials and may, if their concerns are not adequately addressed, bring a due process complaint before state or local educational authorities: in Maryland, such complaints are heard by an ALJ with the state OAH. 20 U.S.C. § 1415(b)(6), (f); Md.Code Ann., Educ. § 8–413. Any party aggrieved by the ALJ's decision may thereafter bring suit in the United States District Court for the District of Maryland or in the circuit court for the county in which the child resides. 20 U.S.C. § 1415(i)(2)(A); Md. Code Ann., Educ. § 8–413(j). In reviewing the ALJ's decision, the court must "determine first whether the state has

'complied with the procedures set forth in the [IDEA],' and second, whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" *Avjian v. Weast,* 242 Fed.Appx. 77, 81 (4th Cir.2007) (per curiam) (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034).[3]

 When a public school system defaults on its obligations under the IDEA, a private school placement may be proper if the placement is reasonably calculated to accord the child educational benefits; in such a case, the school system may be required to reimburse parents for private tuition and related expenses. However, parents who "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk.' They are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (emphasis in original) (quoting *Sch. Comm. of the Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)), *superseded on other grounds as*

recognized in *Pollowitz v. Weast,* 90 Fed. Appx. 438, 444 (4th Cir.2001) (per curiam); *see also Lexington Cty. Sch. Dist. One v. Frazier ex rel. D.T.,* No. 3:10–01808–MBS, 2011 WL 4435690, at \*8 (D.S.C. Sept. 22, 2011) ("Under what has been denominated the *Burlington–Carter* framework, a parent may recover tuition reimbursement if: (1) the proposed IEP was inadequate to offer the child a FAPE, and (2) the private education services obtained by the parents were reasonably calculated to enable the child to receive educational benefits"). Thus, if the court determines that the IEP proposed by the public school was reasonably calculated to provide the child with a FAPE, the court's inquiry is at an end— and it need not separately determine whether a unilateral private placement was proper. *T.S. v. Weast,* Civ. No. DKC–09–1581, 2010 WL 2431021, at \*8 (D.Md. June 10, 2010).

## II. History of the Present Case

### A. Factual Background [4]

M.M. is a minor student with a neurodevelopmental disorder in the severe range of the autism spectrum. (Tr. vol.1, 46:22–47:23.) M.M. has substantial speech and language deficits; he has also been diag-

---

**3.** Plaintiffs in this case have made no allegation, either at the administrative level or in the present litigation, that HCPS violated procedural requirements under the IDEA. For this reason, Plaintiffs' citation to *Leggett v. District of Columbia,* 793 F.3d 59 (D.C.Cir. 2015), in their August 3, 2015, Notice of Additional Authority, is unhelpful. Not only is *Leggett* not binding on this Court, but that case concerned a student whose school failed altogether to produce an IEP and thus violated the student's right to a FAPE. No such procedural violation occurred here.

**4.** When considering a motion for summary judgment, the facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary

judgment. *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Iko v. Shreve,* 535 F.3d 225, 230 (4th Cir.2008). Because Plaintiffs and Defendants have each moved for summary judgment, the Court must consider each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) (quoting *Philip Morris Inc. v. Harshbarger,* 122 F.3d 58, 62 n. 4 (1st Cir.1997)). Having studied the cross-motions, the Court is of the opinion that Defendants are entitled to judgment as a matter of law. Accordingly, the facts and inferences to be drawn therefrom will be taken in the light most favorable to Plaintiffs.

nosed with apraxia, or the "difficulty in organizing, planning and executing ... motor movements for speech volitionally, on demand." (*Id.* vol. 9, 1830:1–3.) Before M.M. enrolled in primary school, HCPS found him eligible for special-education programs; he participated in such programs at various public and private schools, including the nonpublic Trellis School for autistic students ("the Trellis School"), during his early elementary years. (*Id.* vol. 2, 321:17–327:3.) In March 2010, during M.M.'s second-grade year, personnel at the Trellis School conducted a battery of tests: these tests confirmed that M.M. faced significant challenges in the areas of social interaction, communication, and academic concepts. In particular, M.M. scored age equivalencies of thirty-four (34) months for receptive language, twenty-two (22) months for expressive language, twenty-six (26) months for mathematical understanding, and thirty-six (36) months for literacy. (MM_3 at 4.)

For the 2010–11 academic year, HCPS determined that M.M.'s IEP could be implemented at the Cedar Lane School ("Cedar Lane"), a self-contained, special-education environment adjacent to Fulton Elementary School ("Fulton"). (Tr. vol.2, 327:8–11.) M.M.'s first year at Cedar Lane (during which he repeated the second grade) was fairly successful: he achieved five goals on his IEP, and he made progress toward others. (MM_122

at 14–29.) During M.M.'s third-grade year at Cedar Lane (2011–12), he achieved only one goal, but he satisfied numerous objectives. (MM_123 at 17–36.)[5] According to the Father, M.M. was "behaving himself pretty well" during this period. (Tr. vol.2, 336:18–22.) Although M.M.'s core instruction was administered by the special-education professionals at Cedar Lane, at the Parents' request, M.M. attended lunch, recess, and "specials" (*e.g.*, music and art) with the general student population at Fulton. (*Id.* at 333:9–25.) These inclusion opportunities proved rewarding for M.M. A special-education expert who worked with M.M. throughout his years at Cedar Lane recounted that M.M. formed friendships with a group of his general-education peers; that he would "come and sit down with them and they would talk"; and that these relationships "encouraged him to use his words and ... socially engag[e] with them." (*Id.* vol. 6, 1237:10–25.) Janet Zimmerman, a special-education compliance officer who was involved with M.M.'s programming at HCPS, added that the Parents were "in favor of [M.M.] being in general education with nondisabled peers" and that M.M. "did well" in these experiences. (*Id.* vol. 12, 2465:2–14.)

During M.M.'s fourth-grade year (2012–13), tensions arose between the Parents and M.M.'s homeroom teacher.[6] According to the Father, M.M.'s "behaviors escalated" that fall,[7] and M.M. did not accom-

---

**5.** IEPs are structured with objectives and goals. As M.M.'s fifth-grade teacher at Cedar Lane explained, "objectives are building blocks to get to the end result, which would be the goal—the overall goal of [a] skill." The teacher acknowledged that it is possible for a child to make meaningful educational progress through achievement of objectives even if the child is not completing his goals. (Tr. vol.7, 1478:20–1479:5.)

**6.** M.M.'s fourth-grade teacher did not testify before ALJ Nachman. However, Paul Owens, the principal at Cedar Lane, explained that the teacher was absent on "back-to-school" night, upsetting the Mother; he added that the Mother thereafter accused the teacher of failing to provide instruction during M.M.'s first six weeks of fourth grade, an accusation that Principal Owens considered baseless. (*Id.* vol. 13, 2650:12–2651:18.)

**7.** The Father recalled that M.M. was "hitting,

plish any of the goals on his IEP. (Board_3 at 20–36.) On January 24, 2013, and again on February 5, 2013, M.M.'s IEP team convened to plan a series of assessments akin to the tests M.M. had completed back in 2010; the Parents approved several of the prescribed tests, but they forbade the School System from conducting any "assessments that would give any indication of IQ." (Board_11.) The IEP team perceived this limitation as a *de facto* revocation of consent, and they did not proceed with testing at that time. (Board_12.) In July, after retaining counsel, the Parents withdrew their restrictions, and the team moved forward with the planned assessments (MM_24)—but the tests were not completed until later that fall.[8]

Prior to completing M.M.'s assessments, his IEP team determined that he should be placed at West Friendship Elementary School ("West Friendship") for the upcoming 2013–14 academic year. (MM_18 at 2.) West Friendship is M.M.'s neighborhood school;[9] it features a regional Academic Life Skills ("ALS") program. The special-education instructor who would have taught M.M. at West Friendship described the strengths of the program for a student with M.M.'s needs: "[W]e have a very unique luxury in this instance that we are a regional ALS with those supports, but we are also [M.M's] home school. So, as he advanced, we would be able to move him over to the other special ed side that doesn't need the self-contained resources that we're able to provide. So, I think we're the best of both worlds as he makes progress." (Tr. vol.13, 2745:17–23.)[10] Julia DeMino, an HCPS behavior specialist, opined that West Friendship would have afforded M.M. "appropriate models" and "access to a smaller environment for remediation of skills or teaching him new skills." (*Id.* vol. 10, 2186:5–8.) Given M.M.'s profile and his history of successful inclusion experiences, he requires "behav-

---

screaming, scratching, head butting. He threw his water bottle at the high def TV and broke it.... And it[ ] got to a point where [the Parents] had paid for in-home therapists also to work with [M.M.] after school to reinforce what was going on at the school. And they had to stop working with him because his behaviors were so bad." (*Id.* vol. 2, 337:23–338:7.)

**8.** In a Collaborative Report of Assessments issued upon the conclusion of the tests, M.M.'s evaluators reported a standard IQ score of 48 and severe deficiencies across multiple behavioral, academic, and linguistic categories. (ALJ Decision at 46–53; Board_45.) M.M.'s IQ score was calculated pursuant to a Comprehensive Test of Nonverbal Intelligence (CTONI–2). (Board_45 at 6.) A score of 48 is below the first percentile for students in M.M.'s age group. (Tr. vol.10, 2069:22–2070:5.)

**9.** Maryland's LRE regulations provide that a student should be placed "[a]s close as possible to the student's home." Md.Code Regs.13A.05.01.10(C)(1)(a)(v). Janet Zim-

merman elaborated on this requirement in her testimony: "LRE really looks at a child being educated in ... his zoned home school ... so [he] can make friendships ... with the kids in [his] neighborhood ... [and] ride the bus within the kids in [his] neighborhood." (Tr. vol.12, 2611:14–18.)

**10.** The special-education instructor added that "the kids at West Friendship in the regional program are socially more advanced and communicatively and sometimes academically a bit more advanced" than students at Cedar Lane; she perceived that West Friendship was a better fit for M.M. than was Cedar Lane. (*Id.* vol. 13, 2738:10–17.) Cedar Lane's Principal Owens agreed, noting that M.M. had "shown that he could have success at the Fulton Elementary School and had shown that there really wasn't much we [c]ould do for him at Cedar Lane" because his "functional level was higher than [Cedar Lane] students ... and he was needing more time with his peers so he could practice his communication skills. And he would have benefitted from the academics as well." (*Id.* at 2673:7–17.)

ioral, academic ... social, and language models" in an environment that is "meaningful, and purposeful, and engaging." Ms. DeMino perceived that West Friendship fit the bill. (*Id.* at 2193:10–17.) [11]

The Parents expressed no qualms about the goals and objectives of M.M.'s 2013 IEP, nor did they question the extent of his "mainstreaming" with his general education peers. (*Id.* vol. 2, 442:5–14.) The Parents likewise had no problem with the prescribed supplementary aides, services, or accommodations. (*Id.* at 446:3–25.) However, the Parents vehemently objected to the proposed placement at West Friendship, primarily because of negative experiences they had when their daughter C.M.—M.M.'s older sibling—attended the school several years earlier. (*Id.* at 345:14–24; MM_45 at 3.) [12]

On August 19, 2013, the Parents filed a due process complaint with the Maryland OAH, invoking the IDEA's "stay-put" provision. (MM_25.) [13] Subsequently, the Parents reached an agreement with HCPS whereby they withdrew their complaint on condition that M.M. could remain at Cedar Lane pending completion of the assessments. (Bd_33.) Thus, M.M. started his fifth-grade year at Cedar Lane. Unfortunately, by this time his entire peer group had moved on to other programs—and he was placed in a class by himself. (Tr. vol.7, 1489:25–1490:20.) M.M.'s fifth-grade teacher testified that she could "only assume that he felt alone because he was alone," and that "his behaviors showed the frustration." (*Id.* at 1491:1–17.) Cedar Lane's principal, Paul Owens, echoed the teacher's sentiment: "[E]verybody was kind of frustrated at that point because they felt like we really didn't have a place for [M.M.] to be at Cedar Lane.... They could see that he just—he just didn't have that same gleam in his eyes.... And then we would see ... a little bit more behavior from him when he[ was] working, especially when he[ was] working one-on-one with ... a teacher." (*Id.* vol. 13, 2685:9–16.) [14]

---

**11.** Cassandra Vogel, a psychologist at HCPS, similarly testified that "cognitively [M.M. is] similar to students in the ALS program"; that his "behaviors are definitely manageable and could be managed in that setting"; and that the ALS environment would afford him "good exposure for social skill development." (*Id.* vol. 10, 2113:13–17.)

**12.** Carol Hahn, former principal of West Friendship, recounted the family's negative interactions with the school, which started when C.M. was in first grade. The Mother had complained frequently about C.M.'s first-grade teacher; many of the Mother's grievances were trivial. (*Id.* vol. 6, 1132:15–1133:14.) The Mother also sent numerous lengthy e-mails, and she complained when she did not receive prompt replies. (*Id.* at 1139:18–25.) Negative interactions continued into C.M.'s second-grade year, when the Father confronted C.M.'s teacher and shouted at her. (*Id.* at 1143:4–14.) Thereafter, West Friendship administrators ensured that the Parents had an adult escort whenever they

were on the premises. (*Id.* at 1145:17–1146:4.)

The Parents withdrew C.M. from West Friendship after her second-grade year and enrolled her at the St. Louis School, a private religious school. (*Id.* at 1153:1–6.)

**13.** The IDEA provides that, during the pendency of a complaint and subsequent review proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). As a practical matter, parents can delay a proposed transfer (or any other amendment to a child's IEP) by filing a due process complaint.

**14.** Despite M.M.'s behavioral issues in his class of one, he continued to benefit from successful inclusion programming. Raw data recorded during this period shows that M.M. was "compliant, engaged, [and] attentive" at most inclusion classes and that he was unsuccessful only 8% of the time. (Board_44, _63.) M.M.'s teacher added that during inclusion

At an October 2013 meeting, M.M.'s IEP team reviewed the results of his assessments and confirmed that he would be placed at West Friendship. (Board_47 at 45.) Thereafter, the Parents filed a second due process complaint, again triggering the IDEA's stay-put provision and prolonging M.M.'s enrollment at Cedar Lane. (MM_48.) On January 9, 2014, the Parents withdrew their second complaint—electing instead to remove M.M. from HCPS altogether and enroll him at St. Elizabeth. (MM_73, _74.)

St. Elizabeth is a "nonpublic, special education school that serves students [ages] 6 to 21–years-old." (Tr. vol.1, 161:3–5.) Unlike West Friendship, where M.M. would have attended a mix of ALS and general-education classes—and, for that matter, unlike Cedar Lane, where M.M. had substantial inclusion opportunities at the Fulton campus—St. Elizabeth is a highly restrictive environment: all of M.M.'s classmates have disabilities, and he has no opportunities for mainstreaming. Cedar Lane's Principal Owens expressed shock at the Parents' decision to place M.M. in such a restrictive environment given that they had "repeatedly asked for time at Fulton ... and as little time as possible at Cedar Lane." (*Id.* vol. 13, 2694:21–2695:6.) [15]

The Parents requested that HCPS "place and fund" M.M. at St. Elizabeth (MM_74); HCPS refused, contending that it had offered M.M. a FAPE pursuant to the October 28, 2013, IEP and proposed placement at West Friendship (MM_75).

### B. Procedural History

The Parents filed a third due process complaint on May 2, 2014, seeking reimbursement of $33,342.60 in tuition paid to St. Elizabeth for the period spanning January 2014 through June 2014, as well as prospective placement of M.M. at St. Elizabeth for the 2014–15 academic year. (ALJ Decision at 33; Board_71.) Thereafter, ALJ Nachman presided over a fifteen-day hearing, during which the Parents presented seven witnesses and HCPS presented nine. In an October 22, 2014, Decision (OAH No. MSDE–HOWD–OT–14–15722), ALJ Nachman concluded that M.M.'s HCPS IEP was "reasonably calculated to offer [him] a meaningful educational benefit for the 2013–2014 school year" and that the proposed placement at West Friendship was "reasonably calculated to offer [him] a FAPE in the least restrictive environment." (ALJ Decision at 27–28.) ALJ Nachman determined that the "crux" of the Parents' complaint was not a bona fide dispute with the educational programming that M.M. would have received at West Friendship but rather a disdain for the school stemming from their past associations with it. (*Id.* at 77.) [16]

---

periods, M.M. "always looked to his peers to see what behaviors he should have." (Tr. vol.7, 1369:21–25.)

15. Other aspects of M.M.'s transition to St. Elizabeth were equally surprising. For instance, while the Parents had resisted cognitive testing at Cedar Lane in part because they did not want M.M. to be coded for an intellectual disability (*id.* vol. 2, 422:9–13, vol. 13, 2721:5–10), the instructional plan produced by St. Elizabeth listed M.M.'s primary disability as an intellectual disability rather than as autism (Board_88 at 16). Moreover,

while the Parents had insisted throughout M.M.'s years at Cedar Lane that he should remain on a diploma track (tr. vol.8, 1600:17–19), and while M.M. thus participated in annual Maryland School Assessment ("MSA") tests at Cedar Lane, M.M. did not complete the MSA during his first year at St. Elizabeth—suggesting that he is no longer on a diploma track (*id.* vol. 1, 247:20–23, vol. 5, 1064:18–1065:8).

16. On cross-examination at the administrative hearing, the Father elaborated on the Parents' concerns regarding West Friendship. The

Whatever ill will the Parents may have felt toward West Friendship, they did not satisfy their burden of proving that the proposed placement would have deprived M.M. of a FAPE. Consequently, ALJ Nachman denied the Parents' request for tuition reimbursement and placement at St. Elizabeth.

Thereafter, the Parents filed a timely suit in this Court, seeking review and reversal of ALJ Nachman's Decision. (ECF No. 1.) Both parties moved for summary judgment (ECF Nos. 12, 14); those motions are ripe for decision. Neither party has proffered any additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii): consequently, the Court's analysis will take account of only that evidence admitted in the proceedings below.

### III. Standard of Review

■ When faced with cross-motions for summary judgment in the IDEA context, the Court must conduct a modified *de novo* review of the administrative record, giving " 'due weight' to the underlying administrative proceedings." *MM*, 303 F.3d at 530–31. The ALJ's findings of fact, if regularly made and supported by evidence, are considered *prima facie* correct, and "the district court, if it is not going to follow them, is required to explain why it

does not." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991). The ALJ's witness credibility determinations are likewise entitled to deference. *Cty. Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir.2005). Although the Court bases its decision on the preponderance of the evidence, 20 U.S.C. § 1415(i)(2)(C)(iii), the Court must not substitute its own notions of sound educational policy for those of professional educators. *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 999, 1005 (4th Cir. 1997) (reversing district court that rejected "reasonable pedagogical choices" and disregarded "well-supported administrative findings," thereby assuming an "educational mantle which the IDEA did not confer"). The burden of proof during these judicial review proceedings rests on the party seeking relief from the administrative decision below. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

■ The standard of review under the IDEA "works in tandem with the general standard of review for summary judgment." *M.C. v. Starr*, Civ. No. DKC–13–3617, 2014 WL 7404576, at *7 (D.Md. Dec. 29, 2014). The Court will grant summary judgment to a party who demonstrates that (1) there is no genuine dispute as to

---

Parents fretted that they would be barred from communicating directly with M.M.'s teachers and that the teachers would hesitate to work with M.M. due to the Mother's conduct years earlier. (*Id.* vol. 2, 448:11–449:22.) The Parents also complained that West Friendship did not have a speech/language pathologist trained in "PROMPT," their preferred method of speech therapy. (*Id.* at 448:18–21.) And they were apparently offended that they were not invited to observe the ALS program at West Friendship, though they never asked to see it. (*Id.* at 450:13–15.)

Principal Hahn attempted to allay the Parents' concerns in her testimony. She rejected the notion that the Parents would have been

cut off from the life of the school, countering that "one of the critical elements to ... [the] special ed program is that connection [the] special educators make with parents." (*Id.* vol. 6, 1180:16–18.) She emphasized that there would have been no restrictions stemming from the Parents' conduct while C.M. was enrolled at the school (*id.* at 1181:12–16); she also pointed out that none of C.M.'s former teachers would have been involved with M.M.'s program (*id.* at 1188:10–12). As for PROMPT therapy, West Friendship had proactively dispatched one of its speech/language pathologists for PROMPT training after learning that M.M. might be joining the ALS program. (*Id.* at 1181:19–1182:14.)

any material fact and (2) that party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the opposing party. *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Iko v. Shreve,* 535 F.3d 225, 230 (4th Cir.2008). Even so, the opponent may not rest upon the mere allegations or denials of her pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed.R.Civ.P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed.R.Civ.P. 56(c)(4).

## IV. Analysis

Plaintiffs challenge ALJ Nachman's Decision on several grounds. They argue that the ALJ's factual findings and witness credibility determinations are not entitled to deference. They allege that the ALJ should have considered evidence of M.M.'s progress at St. Elizabeth in determining whether HCPS offered M.M. a FAPE. They also assert that the ALJ improperly discounted the relevance of M.M.'s performance at Cedar Lane. The Court addresses each of these contentions in turn.

### A. ALJ Nachman's Factual Findings and Credibility Determinations

Plaintiffs acknowledge, as they must, that federal courts owe "due weight to the findings of the local and state educational agencies." (ECF No. 12–1 at 18.) Nevertheless, Plaintiffs contend that ALJ Nachman's Decision "does not plausibly fall within the 'norm of a fact-finding process' " but rather appears "arbitrary and capricious," ostensibly because he "ignore[d] substantial portions of the record before him." (*Id.* at 20–21.)

In *Doyle,* the Fourth Circuit explained that, in determining the extent to which an administrative decision warrants deference, a reviewing court should "examine the way in which the state administrative authorities ... arrived at their administrative decision and the methods employed." 953 F.2d at 105. In other words, the inquiry turns on the *process* by which the ALJ reaches his decision.[17] More recently, in *Z.P.,* the Fourth Circuit reversed the district court after concluding that it "erred by failing to give deference to the decision of the state hearing officer." 399 F.3d at 311. The *Z.P.* district court thought that the hearing officer gave excessive weight to testimony by the parents' witnesses, but the court of appeals

---

**17.** In *Doyle,* a state-level review officer failed to consider findings of fact made by a local hearing officer and thereafter reached a result plainly irreconcilable with those findings. The Fourth Circuit considered the review officer's method an improper departure from fact-finding norms, and it held that the facts found as a result of that departure were entitled to no weight—whereas the facts found by the local hearing officer were *prima facie* correct. 953 F.2d 100, 105 (4th Cir.1991).

disagreed, observing that the officer's "opinion was thorough, with many citations and references to the testimony of the School Board's witnesses." *Id.* at 305. The officer simply found the parents' witnesses more persuasive. *Cf. Bd. of Educ. v. Bauer,* Civ. No. JFM–99–3219, 2000 WL 1481464, at *3 (D.Md. Sept. 12, 2000) ("[I]n establishing the factual record the ALJ clearly has the discretion to rely on specific documents, and give the testimony of some witnesses greater weight than others."). In fact, the Fourth Circuit has indicated that only a considerable departure from fact-finding norms at the administrative level will justify a district court's decision to withhold the deference that is ordinarily due. *See J.P. ex rel. Peterson v. Cty. Sch. Bd.,* 516 F.3d 254, 259 (4th Cir.2008) ("In this case, there is nothing in the record suggesting that the hearing officer's process ... was anything other than ordinary. That is, the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.").

██ In this case, ALJ Nachman presided over fifteen days of hearings; thereafter, he composed an eighty-nine page opinion complete with lengthy excerpts from the transcripts and extensive citations to both parties' exhibits. It can hardly be suggested that such a thorough analysis is equivalent to "flipping a coin" or "throwing a dart." Indeed, in crafting his detailed Decision, ALJ Nachman appears to have far exceeded what circuit law requires of him. *See id.* at 262 (finding hearing officer's twenty-five page opinion, with brief one- or two-page summaries of expert testimony, sufficiently detailed).[18]

---

**18.** Because ALJ Nachman followed appropriate administrative procedures, the Court treats his findings as *prima facie* correct. But even were the ALJ *not* entitled to deference, Plaintiffs have failed to proffer a convincing argument that any of his findings are unsupported by evidence or otherwise materially incorrect.

Plaintiffs dispute the ALJ's conclusion that the "crux" of their complaint was their opposition to M.M.'s placement at West Friendship (ECF No. 12–1 at 21)—yet the Father expressly acknowledged that the "only thing that [the Parents] objected to was that [M.M.'s] program would be delivered at West Friendship" (tr. vol.2, 447:1–4). Plaintiffs also challenge the ALJ's determination that the programs at Cedar Lane and West Friendship were different (ECF No. 12–1 at 22)—but there are obvious and important distinctions between attending a self-contained special-education program in a class of one and attending a blend of general and special classes at a high-performing neighborhood campus with peers in each group (tr. vol.6, 1156:12–23, vol.13, 2727:2–3, 2731:11–19, 2769:14–18).

Additionally, Plaintiffs characterize as "inexplicable" the ALJ's findings that M.M. did not have significant behavioral problems prior to the 2013–14 academic year and that M.M.'s inclusion classes at Fulton were a success (ECF No. 12–1 at 22)—yet Julia DeMino, a behavioral-programming expert, testified that M.M.'s behaviors during 2012–13 were "minimal and very inconsistent" and that M.M.'s isolation likely contributed to his declining behavior during the fall of 2013 (tr. vol.10, 2164:16–18, vol.11, 2272:9–14). Principal Owens added that some of the behaviors M.M. exhibited during his final months at Cedar Lane were behaviors the child had not exhibited in the past. (*Id.* vol. 13, 2715:5–10.) As for inclusion, the data speaks for itself: between September 3, 2013, and January 2, 2014, 65% of M.M.'s inclusion opportunities were deemed successful; in an additional 28% of such opportunities, M.M. required only some redirection. (Board_63.)

Finally, Plaintiffs argue that the ALJ erred in finding that M.M.'s IEP team could not begin his 2013 assessments before receiving consent for cognitive testing (ECF No. 12–1 at

In addition to challenging ALJ Nachman's factual findings, Plaintiffs assail his credibility determinations, contending that "the ALJ simply relied on all the HCPS expert witnesses as 'convincing,' and dismissed the parents' witnesses as 'unpersuasive,' without providing reasoning for his reliance." (ECF No. 12–1 at 50.) Plaintiffs' argument parallels the argument raised by the parents in *S.A. v. Weast*, 898 F.Supp.2d 869 (D.Md.2012).[19] In *S.A.*, the parents complained that the "ALJ failed to acknowledge or thoroughly discuss their expert witnesses, providing no explanation as to why she gave their witnesses less deference than [the school's] witnesses." *Id.* at 877. The district court rejected the parents' complaint, explaining that "an IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *Id.* For that matter, "the Fourth Circuit has consistently held that an ALJ's *implicit* credibility determinations are entitled to the same deference as *explicit* findings." *Id.* (emphases added); *see also Z.P.*, 399 F.3d at 306 ("*Doyle* ... requires the *district court* to explain its reasons for rejecting the findings of the hearing officer; it does

not require the *hearing officer* to explain in detail its reasons for accepting the testimony of one witness over that of another." (emphases in original)); *Cty. Sch. Bd. v. R.T.*, 433 F.Supp.2d 657, 678 (E.D.Va.2006) ("As to credibility determinations, the Fourth Circuit has consistently held that reviewing courts should defer to the hearing officer's determinations.").

In presenting his credibility determinations, ALJ Nachman again went above and beyond what circuit law requires. He explained in detail why he discounted the Parents' witnesses. As for the Parents' hired expert, Dr. Vincent Culotta, ALJ Nachman found that he had "no knowledge of [M.M.'s] program or his success at Fulton to know whether [M.M.] succeeded in that less restrictive setting, which is called for in the HCPS IEP." (ALJ Decision at 70.)[20] As for the educators from St. Elizabeth, their testimony was even less helpful. Debra Boyce, a program coordinator, had "absolutely no opinion on the appropriateness of the HCPS program" and "knew nothing about [M.M.'s] past success in the inclusionary setting." (*Id.* at 72, 74, 126 S.Ct. 528.)[21] Nano Kolls, a behavior interventionist, "did not have access to the data

---

23)—but as an HCPS special-education expert explained, "[a]ny time you do assessments on a student you want to get a true picture of who they are in any regard that you could assess," and knowledge of IQ "has to do with everything, understanding, comprehension, [and] communication" (tr. vol.6, 1281:23–1282:7). Gisele Morin–Connolly, M.M.'s speech/language pathologist, added that it is "not best practice" to do a speech and language assessment without companion cognitive testing: "You don't do one without the other." (*Id.* vol. 8, 1596:13–20.)

19. The parallel is perhaps not altogether surprising, given that Plaintiffs' counsel in this case also represented the parents in *S.A.*

20. Dr. Culotta's direct exposure to M.M. was limited to a single two-hour observation at St. Elizabeth. (*Id.* vol. 1, 33:16–34:6.) School

psychologist Cassandra Vogel noted that while Dr. Culotta "may have gleaned some information from observing [M.M.] during those two hours, it definitely wasn't a multi-method, multi-source assessment." (*Id.* vol. 10, 2115:2–5.) Dr. Culotta himself admitted that he never spoke with anyone at Fulton regarding M.M.'s inclusion experiences (*id.* vol. 1, 122:5–8), and he suggested that he placed greater importance on the "predictive validity of ... standardized test scores" than on data regarding M.M.'s actual performance in a mainstream environment (*id.* at 125:20–126:4).

21. Ms. Boyce conceded that she had considered neither the appropriateness of the program at West Friendship nor whether M.M. could be programmed for in a less restrictive environment than St. Elizabeth. (*Id.* at 216:24–217:6.)

gathered from [M.M.'s] inclusionary activities at Fulton." (*Id.* at 76.) Colleen Strong, a speech/language pathologist, "was not even aware that [M.M.] was being educated with nondisabled peers." (*Id.*) And M.M.'s fifth-grade teacher at St. Elizabeth admitted that the Fulton inclusion data showed M.M. had been doing well with his nondisabled peers. (*Id.* at 77.) At bottom, while the Parents' witnesses may have been suitably equipped to discuss M.M.'s performance at St. Elizabeth, they were utterly unqualified to discuss his performance at HCPS—and because the primary issue before the ALJ concerned whether the proposed placement at West Friendship constituted a FAPE, the testimony of these witnesses had limited utility.[22]

■ Because Plaintiffs have not shown that ALJ Nachman's findings and credibility determinations were irregularly made, the Court presumes the validity of such findings and determinations for the purpose of its analysis. Of course, this presumption does not relieve the Court of its independent responsibility to determine whether HCPS offered M.M. a FAPE in 2013–14. But for the reasons explained below, the Court concludes that the IEP and M.M.'s corresponding placement at West Friendship were reasonably calculated to accord M.M. an educational benefit. Because the School System offered M.M. a

FAPE, it had no obligation to fund his private tuition at St. Elizabeth.

### B. M.M.'s Progress at St. Elizabeth

Plaintiffs contend that an ALJ "must consider evidence of a student's meaningful educational progress that occurred outside of a school system when considering the appropriateness of the proposed IEP." (ECF No. 12–1 at 24.) They vigorously contest ALJ Nachman's conclusion that M.M.'s "progress at St. Elizabeth is immaterial to the question of whether the [HCPS] IEP [was] reasonably calculated to lead to education[al] progress" and whether the "placement [was] appropriate for [M.M.]." (ALJ Decision at 87.) Plaintiffs perceive that M.M. has done "exceedingly well" at St. Elizabeth (ECF No. 12–1 at 29), and they believe that the ALJ should have treated this purported progress as a yardstick for measuring the School System's IEP and placement decision. Plaintiffs' theory fails as a matter of law, fact, and policy.

■ With regard to the law, Plaintiffs rely principally on two cases that address the relevance of a student's response to educational programming: *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009), and *Ash v. Lake Oswego School District*, 980 F.2d 585 (9th Cir.1992). In *Schaffer*, the Fourth Circuit considered a challenge relating to "additional evidence" beyond the four corners of the administrative record.[23] In so doing, *Schaffer* reaf-

---

22. In addition to complaining that ALJ Nachman improperly discounted their experts, Plaintiffs argue that the School System's witnesses were not credible because they could not recall specific details about M.M.'s performance while he was under their tutelage—*e.g.*, the number of goals he achieved during particular periods or the maladaptive behaviors he exhibited on certain occasions. (ECF No. 12–1 at 51–53.) Given that the administrative hearing took place many months after M.M. left Cedar Lane, it is unsurprising that his former educators—who are presumably

responsible for many students with complex academic and behavioral needs—were unable at times to recall the particularities of M.M.'s performance. Their imperfect recollection does not negate their extensive testimony regarding M.M.'s general performance, his progress, and his successful mainstreaming experiences.

23. In this respect, *Schaffer* is not entirely apposite to the case at bar: *Schaffer* dealt with the admissibility and relevance of evidence that emerged *subsequent* to the administrative

firmed a prior holding that "where an IEP is accepted, evidence of educational progress under that IEP is useful in deciding whether the IEP was appropriate." 554 F.3d at 478 (emphasis added) (citing *MM*, 303 F.3d at 532).[24] But nothing in *Schaffer* suggests that evidence of a student's performance outside of a public school system, in situations in which the IEP has been rejected, should retroactively reflect on the propriety of that IEP. On the contrary, *Schaffer* counseled against the use of after-acquired evidence to "Monday-morning quarterback the school system," *id.* at 476, and it added that judicial review of IEPs "is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calcu-lated to enable the child to receive edu-cational benefits.'" *Id.* at 477 (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034). So *Schaffer* is of little help to Plaintiffs here. Similarly unhelpful is Ash, an out-of-circuit case that predated *Schaffer* by nearly two decades and that merely recognized that the needs of a disabled child at the time of trial may reflect something of the child's needs at the time of IEP formulation. 980 F.2d at 588.[25] In fact, the Court is aware of no case that stands for Plaintiffs' sweeping proposition that an ALJ (or, for that matter, a district court) should consider a student's after-occurring progress in a private-school environment in determining whether the public-school system formerly offered the student a FAPE.[26]

hearing, whereas in this case the ALJ heard—but discounted—evidence of M.M.'s progress at St. Elizabeth. However, Plaintiffs and Defendants seem to agree that the reasoning of *Schaffer*, if not its holding, is instructive here. Cf. *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, Civ. No. DKC–2008–1757, 2009 WL 3246579, at *9–10 (D.Md. Sept. 29, 2009) (applying *Schaffer* to after-acquired evidence brought before the ALJ).

It is worth noting that while the district court in *Schaffer* admitted evidence of a student's tenth-grade IEP in evaluating the propriety of his eighth-grade IEP, the district court granted little weight to that evidence, "correctly recogniz[ing] that review of IEPs must be largely prospective" as opposed to a "hindsight-based review." 554 F.3d 470, 478 (4th Cir.2009).

**24.** Plaintiffs read *MM* for the expansive proposition that there is "truly no better evidence of whether an IEP *could have been successful* than information about how the child performed during the school year in question, whether at a public or private school." (ECF No. 12–1 at 28 (emphasis in original).) That reading seems gratuitous, particularly in light of *Schaffer*. Moreover, *MM* dealt with an unusual set of facts not relevant here: the student in *MM* accepted her IEP but thereafter enrolled in a complementary home-based program, and she sought reimbursement for that companion program. Although the dis-trict court thought the IEP was inadequate, the Fourth Circuit disagreed, finding that the district court had accorded insufficient deference to the judgment of the school district's professional educators and further rejecting the assertion that the student's progress was attributable to the home-based program rather than the IEP. 303 F.3d 523, 532–33 (4th Cir.2002).

**25.** Moreover, in *Ash*, the district court emphasized that the "first and foremost question" was the student's condition *at the time of IEP formulation*. 980 F.2d 585, 588 (9th Cir.1992). Thus, aside from being outdated and nonbinding in this Circuit, *Ash* does less work for Plaintiffs than they perceive.

**26.** Plaintiffs' extensive citations in their cross-motion and reply brief, though indicative of competent and conscientious lawyering, are nevertheless ultimately unavailing. In *M.S. ex rel. Simchick v. Fairfax County School Board*, 553 F.3d 315 (4th Cir.2009), the Fourth Circuit considered a student's progress at the private Lindamood—Bell Center—but its analysis was limited to the second prong of the *Burlington–Carter* inquiry, as the school district did not dispute that it had failed to provide the student with a FAPE. Accord *Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576 (D.Md.2001) (where school district placed student at private school, such

With regard to the facts, it is far from clear that M.M.'s progress at St. Elizabeth has been as uniformly positive as Plaintiffs would have the Court believe. While there is certainly evidence in the record, primarily in the nature of testimony from faculty and staff at St. Elizabeth, suggesting that M.M. has made educational and behavioral strides, there is also evidence suggesting that his progress has been overstated. For instance, M.M.'s fifth-grade teacher at Cedar Lane testified that M.M. displayed first-grade comprehension skills at Cedar Lane, compared with the kindergarten-level skills he displayed at St. Elizabeth; that M.M.'s math curriculum was more rigorous at Cedar Lane than at St. Elizabeth; and that M.M. demonstrated an ability to form all the letters of his first name while at Cedar Lane, compared with a St. Elizabeth report showing that he was still working on 'a' and 'e.' (Tr. vol. 7, 1389:161404:3; MM_89.) HCPS witnesses testified that M.M.'s behavior as reported by St. Elizabeth was worse than the behavior he exhibited during his final months at Cedar Lane. (Tr. vol. 7, 1418:3–12, vol. 10, 2237:9–15; MM_89 at 19; MM_101.) A School-Wide Information System report tracking M.M.'s behavior between January and June 2014 corroborates that testimony, showing that M.M. was referred to the St. Elizabeth counseling room fifty-one times during that period for behaviors ranging from defiance and elopement to aggression and intentional self-defecation. (MM_96.) The Court is obviously not in a position to don the educator's mantle and critique M.M.'s academic and behavioral performance—and fortunately, given that the law does not require HCPS to compete with or outperform St. Elizabeth, the Court need not make a point-for-point comparison. But proof of M.M.'s continued difficulties discredits Plaintiffs' theory that M.M. was languishing at Cedar Lane and that it took a highly restrictive environment like St. Elizabeth to unlock his true potential.

Finally, with regard to policy, Plaintiffs' theory would seem to create a perverse incentive fundamentally at odds with the Supreme Court's definition of a FAPE, i.e., a "basic floor of opportunity" that provides disabled children with "educational benefit." *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. Parents, displeased with the services available in their local public-school systems, might be inclined to enroll their children in elite private programs with top-notch services—with the hope that, if their children make gainful prog-

placement lent credence to parents' decision to enroll student at private school in prior year in which district failed to develop IEP). In *K.S..v. District of Columbia,* 962 F.Supp.2d 216 (D.D.C.2013), the court recognized that academic progress under a prior IEP may be relevant in determining the appropriateness of a challenged IEP—but the court said nothing about consulting progress in a subsequent private enrollment. Even *County School Board v. R.T.,* 433 F.Supp.2d 657 (E.D.Va. 2006), which is arguably Plaintiffs' strongest authority, stops short of Plaintiffs' sweeping proposition here. *R.T.,* which predated *Schaffer's* disapproval of "Monday-morning quarterback[ing]," found that a hearing officer acted properly within his discretion when he considered evidence of a subsequent private placement "only for the limited purpose" of assessing the school district's argument that the student was so profoundly impaired that he could have made no greater progress than that which he made under his IEP. Assuming *arguendo* that *R.T.* survives *Schaffer, R.T.* stands at most for the proposition that there may be narrow circumstances in which after-acquired evidence of private-school performance is relevant to assessment of an IEP. *R.T.* certainly does not embrace unrestrained use of private-school performance to second-guess public-school systems, a proposition at odds with established principles under the IDEA. *See Tice ex rel. Tice v. Botetourt Cty. Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir.1990) ("[O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals.").

ress in such elite programs, the school systems might be required to pick up the tab. But that turns the IDEA on its head: it was never meant to guarantee children the best education money can buy; it was meant to provide children with a FAPE. There is little doubt that premier private schools, which may charge tens of thousands of dollars in tuition each semester, have resources far beyond those available in typical publicly funded school systems. But if Congress had intended these private schools to serve as the gold standard under the IDEA, it would have drafted a very different statute.

### C. *M.M.'s Placements at Cedar Lane and West Friendship*

#### 1. *Cedar Lane*

Aside from their notion that ALJ Nachman improperly discounted evidence of M.M.'s progress at St. Elizabeth, Plaintiffs argue that the ALJ erroneously failed to take account of M.M.'s performance at Cedar Lane. From Plaintiffs' perspective, M.M. had stagnated—perhaps even regressed [27]—and since the programs at Ce-

dar Lane and West Friendship were materially similar, there was "no reason to expect that M.M. would have performed differently at West Friendship in any meaningful way." (ECF No. 12–1 at 45.)

While after-acquired evidence of a student's progress in a private school is an improper rubric for measuring the efficacy of a public-school IEP, courts have considered evidence of a student's public-school progress when evaluating the propriety of a continued placement. *See Bd. of Educ. v. I.S.*, 325 F.Supp.2d 565, 587 (D.Md.2004) (affirming ALJ order requiring district to fund student's private-school placement where student made "little more than *de minimis* progress" under her IEPs). *But see O.S.*, 804 F.3d at 361 (affirming ALJ and district court determinations that public school provided student with a FAPE, even though student's progress was slow and some evidence indicated that he had regressed in certain areas); *cf. Bd. of Educ. v. Michael M.*, 95 F.Supp.2d 600, 609–10 (S.D.W.Va.2000) ("Although progress may be an indicator of whether an IEP was reasonably calculated to provide

---

**27.** Plaintiffs contend that M.M.'s behavior worsened during his time at Cedar Lane: they compare a 2010 report from the Trellis School (which described such maladaptive behaviors as crying, screaming, hitting, and pinching) with evidence of M.M.'s behavioral deficiencies in 2013 (which included hitting, elopement, and vocal outbursts). (ECF No. 12–1 at 41.) The Court is not certain how to weigh the relative severity of a screaming episode by a nine-year-old *vis-a-vis* a vocal outburst by a twelve-year-old, but taking at face value ALJ Nachman's finding that M.M.'s behavior deteriorated during the fall of 2013 (ALJ Decision at 25), his teacher offered a plausible explanation: he was isolated in a class of one due to the Parents' invocation of the IDEA's stay-put provision, and his "behaviors showed the frustration" associated with being alone. (Tr. vol.7, 1491:12–17.) Julia DeMino echoed the teacher's observation, testifying that "[if] a child is not appropriately placed, that can be a cause for mal-

adaptive or problem behavior." (*Id.* vol. 10, 2207:7–9.)

Plaintiffs also contend that M.M.'s speech regressed during his time at Cedar Lane, but the record on this point is less than clear. On Kaufman Speech Praxis Tests administered in 2010 and again in 2013, M.M. scored age equivalencies below two years. (MM_3 at 7; Board_45 at 16.) The 2013 test results note that M.M.'s vowel-sound inventories increased by seven over the three-year period, though he gained only one consonant (Board_45 at 17.) In 2010, M.M. produced unintelligible vocalizations (MM_3 at 6); in 2013, he used single word approximations. (Board_45 at 4.) According to the Father, however, by the time M.M. left Cedar Lane, he was "grunting." (Tr. vol.2, 407:6–8.) There is no question that M.M. suffers from severe speech and language deficits—but the record seems to show inconsistent performance (and perhaps even some slight gains) rather than regression.

a free appropriate public education, it is ultimately irrelevant whether the child did in fact make progress pursuant to the IEP. If the child did not make substantial progress, or even if the child regressed during the school year, the school district still meets its statutory mandate so long as the school district can prove that the IEP, when it was created, was reasonably calculated to provide some educational benefit." (footnote omitted)).

If the record showed that M.M. made no progress whatsoever at Cedar Lane, or that his progress was truly *de minimis* in light of his ability, such facts might bear on the propriety of his IEP. But the record tells a different story. Each of M.M.'s IEP documents reflects particularized academic and social gains. (MM_122; MM_123; Board_3; Board_47.) A grade report spanning November 2012 through November 2013 shows that M.M. received mainly Bs in his classes, while a progress summary from that same period shows gradual improvement in the areas of, *inter alia,* phonemic awareness, number matching, and fine motor skills. (Board_53.)[28] An HCPS special-education expert testified that M.M. demonstrated growth in reading, math, science, and social studies during his fourth-grade year. (Tr. vol.6, 1250:22–1251:2.) Gisele Morin–Connolly, M.M.'s speech/language pathologist, reported some improvement with M.M.'s speech and articulation during the 2011–12 academic year; she interpreted notations on the 2012–13 IEP as reflecting further, gradual achievement. (*Id.* vol. 7, 1535:9–12, 1546:4–9.) She added that M.M. was "making progress, but it was slow progress. It's difficult for [M.M.]. [He] is just one of those students that has a difficult time with speech." (*Id.* at 1578:10–13.)

Plaintiffs make much of the fact that, while M.M. achieved five IEP goals during the 2010–11 academic year and an additional goal during the 2011–12 academic year, he achieved no IEP goals during his remaining eighteenth months at HCPS. (ECF No. 12–1 at 34.) However, as noted in Part II.A, *supra,* IEP goals are composed of objectives, and the completion of objectives is itself a form of achievement. Plaintiffs admit that M.M. accomplished 23% of his objectives during that final eighteen-month stretch (*id.* at 35), and a close study of the IEPs shows some progress even within those objectives that M.M. did not complete. Twenty-three percent may not seem like an impressive figure—but M.M. has a standard IQ of *48.* For a child with his profound difficulties, even slight gains require considerable time, energy, and patience. M.M.'s progress, though slow, was commensurate with his cognitive ability. (Tr. vol.8, 1594:19–24, vol.9, 1904:24–1905:3, vol.10, 2104:16–23.)[29]

---

28. Plaintiffs deride this progress summary in their memorandum, arguing at length that the percentages are inconsistent with the data reported in the IEP progress reports. (ECF No. 12–1 at 35–39.) The Court agrees that some of the percentages seem optimistic and perhaps suspect; however, as Defendants point out, counsel for Plaintiffs neglected to cross-examine the HCPS witness who described this exhibit at the administrative hearing below. In any event, it does not appear that ALJ Nachman treated this exhibit as dispositive, and the Court certainly does not view it as such; rather, it is one of many pieces of evidence duly admitted into the administrative record and tending to show that M.M. made *some* progress during his time at Cedar Lane.

29. The Court adds that excessive focus on quantitative goal completion, as compared with other, more subjective and qualitative, measures of growth, may produce negative outcomes. Schools with larger populations of significantly disabled students may be exposed to undue criticism, as they are unlikely to maintain the same goal-completion rates as schools with higher-functioning students. Moreover, IEP coordinators may be incentivized to lower the bar and draft simpler goals

## 2. West Friendship

To the extent that M.M.'s growth at Cedar Lane was slowing toward the end of his time there, that only reinforces the School System's decision to transfer him to a school that was better equipped to meet his particular needs. An HCPS special-education expert testified that, while M.M. was "making progress" during his fourth-grade year, "his inclusion hours were building and he was showing the need to . . . get more than what Cedar Lane could offer him." (*Id.* vol. 6, 1250:17–20.) Principal Owens added that M.M. had "shown that he could have success at the Fulton Elementary School and had shown that there really wasn't much we [c]ould do for him at Cedar Lane" because his "functional level was higher than the [Cedar Lane] students . . . and he was needing more time with his peers so he could practice his communication skills." (*Id.* vol. 13, 2673:3–16.) The Parents understood that HCPS believed Cedar Lane was a poor fit for M.M.'s fifth-grade programming: the Father noted that the fifth-grade teacher "on back to school night . . . said this is not what [they] want for [M.M.]." (*Id.* vol. 4, 687:17–688:8.)

It is undisputed that the services prescribed by M.M.'s 2013–14 IEP would have carried over to his placement at West Friendship, but that does not prove, as Plaintiffs seem to believe, that the Cedar Lane and West Friendship placements were materially indistinguishable. At Cedar Lane, M.M. spent many hours each week in a class of one at a self-contained special-education school that catered to lower-functioning students. His behavior deteriorated, reflecting his frustration. But when M.M. had occasion to mingle with children at neighboring Fulton Elementary, he thrived: he modeled their behavior; he attempted to communicate with them; he seemed happy.[30] At West Friendship—M.M.'s home school—M.M. would have split his time between special ALS classes and regular classes, always in the company of peers. If M.M. continued to thrive in the mainstream setting, the West Friendship IEP team could adjust his hours and place him in additional general-education classes; if he needed some concentrated support, the school's ALS professionals were standing by to assist him.

To the extent Plaintiffs question the allocation of hours, the provision of services, or any other aspect of the HCPS IEP,[31] it is worth noting that St. Elizabeth developed a strikingly similar program for M.M. In fact, St. Elizabeth relied heavily on the HCPS IEP from January through mid-April 2014, and when the private school finally got around to producing its own

---

that are easier to achieve but that do not reflect a student's true potential. Where, as here, it appears that professional educators have made a careful and concerted effort to craft an educational program that meets the needs of a student whose cognitive abilities fall below the first percentile for his age group, the Court is particularly reluctant to disturb that effort simply because the student's objectively measurable progress is slow.

30. M.M.'s teacher recounted that the first time she saw M.M. smile during his fifth-grade year was when they "pulled up to the door at Fulton and he realized what [they] were doing." (Tr. vol.6, 1317:15–18.)

31. The Court is not convinced that Plaintiffs have a good-faith quarrel with any of these programming details. Though Plaintiffs write in their memorandum of law that the School System has been "blind to [M.M.'s] lack of progress, and therefore has not proposed a more intensive program to meet his very significant needs" (ECF No. 12–1 at 3), the Father admitted that the only aspect of the HCPS program to which the Parents objected was the proposed placement at West Friendship (tr. vol.2, 447:1–4).

plan, it "built on the Howard County IEP that [it was] provided with." (*Id.* vol. 1, 262:15–25, vol. 5, 1081:7–8.).

The *one* material difference between the HCPS and St. Elizabeth programs is that HCPS prescribed mainstreaming opportunities in a nonrestrictive environment (pursuant to the mandate of 20 U.S.C. § 1412(a)(5)(A)) whereas St. Elizabeth educates M.M. in a highly restrictive environment for severely disabled children. Yet throughout M.M.'s academic career at HCPS, the *one* thing the Parents had consistently requested was inclusion. The Father admitted it (tr. vol.2, 333:10–15, 345:3–9); the record supports it (MM_8 at 2); Dr. Culotta, the Parents' hired expert, acknowledged it (tr. vol.1, 77:8–14); the faculty at Cedar Lane echoed it (*id.* vol. 6, 1305:22–1306:2, vol. 7, 1375:20–25, vol. 12, 2465:2–10). As recently as November 25, 2013—roughly six weeks before the Parents informed HCPS that they would be withdrawing M.M. from Cedar Lane—the Mother affirmed that M.M. "enjoys being around typical peers" and that "sending him until he is 21 to a private school without typical peers . . . would [not] be in his best long-term interest." (MM_54 at 3–4.) The School District can hardly be faulted for complying with the Parents' wishes (particularly given the data that suggested M.M. benefited from mainstreaming), and the Court is not inclined to penalize the School District for its diligent effort to craft an IEP that met the family's expectations. *See MM,* 303 F.3d at 533 n.14 ("[A] parent may 'naturally' not 'use the fact that the District complied with their wishes as a sword in their IDEA action.' . . . As a general matter, it is inappropriate, under the IDEA, for parents to seek cooperation from a school district, and then to seek to exact judicial punishment on the school authorities for acceding to their wishes." (quoting *Cleveland Heights–Univ. Heights City Sch. Dist. v. Boss ex rel. Boss,* 144 F.3d 391, 398 (6th Cir.1998))).[32]

## V. Conclusion

"The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP." *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086 (1st Cir.1993). It may be that M.M.'s progress in the HCPS system was slow; it may even be that St. Elizabeth offered M.M. a superior education, and if his parents wish to keep him in private school, that is certainly their prerogative. The Court need not—and, indeed, *cannot*—divine what is best for M.M. going forward: that is not the Court's role. Rather, the Court must simply determine whether HCPS offered M.M. a FAPE. And ALJ Nachman's regularly made findings show that the 2013–14 HCPS IEP and corresponding placement decision were reasonably calculated to accord M.M. an educational benefit. In light of the deference the Court owes to the ALJ's findings and to the judgment of the School District's professionals, and after careful review of the record, the Court concludes that HCPS provided M.M. with a FAPE. Because the Court resolves this

---

32. Thus, Plaintiffs' audacious assertion that ALJ Nachman spent "much of his opinion faulting the parents for changing their minds in what type of placement they were asking for" and "blaming the parents for disagreements over M.M.'s educational program" (ECF No. 12–1 at 45) is not only hyperbolic but also meritless. The ALJ did not "blame" the Parents for their 180–degree turn, but neither did he sanction Defendants for their inability to forecast that radical shift in perspective.

case at prong one of the *Burlington–Carter* inquiry, it need not decide the separate question whether M.M.'s private placement was proper. *T.S.*, 2010 WL 2431021, at *8.

For the foregoing reasons, ALJ Nachman's October 22, 2014, Decision is AFFIRMED, and an Order shall enter DENYING Plaintiffs' Motion for Summary Judgment (ECF No. 12) and GRANTING Defendants' Cross–Motion for Summary Judgment (ECF No. 14).

## *ORDER*

For the reasons stated in the foregoing Memorandum, it is ORDERED:

1. The October 22, 2014, Decision by Administrative Law Judge Marc Nachman (OAH No. MSDE–HOWD–OT–14–15722) is AFFIRMED;

2. Plaintiffs' Motion for Summary Judgment (ECF No. 12) is DENIED;

3. Defendants' Cross–Motion for Summary Judgment (ECF No. 14) is GRANTED;

4. The Court enters JUDGMENT FOR DEFENDANTS;

5. The Clerk is DIRECTED to FORWARD COPIES of this Order and the accompanying Memorandum to the Family Support and Dispute Resolution Branch of the Maryland State Department of Education, Division of Special Education; and

6. The Clerk is further DIRECTED to CLOSE THIS CASE.