**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 14-1994**

———————————

O.S., by and through his Parents; MICHAEL S. and AMY S., of
Fairfax County, VA,

       Plaintiffs - Appellants,

    v.

FAIRFAX COUNTY SCHOOL BOARD, of Fairfax County, VA,

       Defendant - Appellee.

———————————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, Senior
District Judge.  (1:13-cv-01580-TSE-IDD)

———————————

Argued:  September 16, 2015      Decided:  October 19, 2015

———————————

Before MOTZ and WYNN, Circuit Judges, and DAVIS, Senior Circuit
Judge.

———————————

Affirmed by published opinion.  Judge Motz wrote the opinion, in
which Judge Wynn and Senior Judge Davis joined.

———————————

**ARGUED**: Dennis Craig McAndrews, MCANDREWS LAW OFFICES, Berwyn,
Pennsylvania, for Appellants.  John Francis Cafferky,
BLANKINGSHIP & KEITH, P.C., Fairfax, Virginia, for Appellee.  **ON
BRIEF**: Michael Edward Gehring, Caitlin Elizabeth McAndrews,
MCANDREWS LAW OFFICES, Berwyn, Pennsylvania, for Appellants.
Patricia A. Minson, BLANKINGSHIP & KEITH, P.C., Fairfax,
Virginia, for Appellee.

———————————

DIANA GRIBBON MOTZ, Circuit Judge:

This case poses the question of whether the standard for a free appropriate public education under the Individuals with Disabilities Education Act has changed since Board of Education v. Rowley, 458 U.S. 176 (1982). We hold that it has not and affirm the judgment of the district court that the Fairfax County School Board did not violate that standard in this case.

I.

A.

The Individuals with Disabilities Education Act (IDEA) creates a federal grant program to assist states in educating children with disabilities. See 20 U.S.C. § 1411 (2012). To receive federal funding, states must provide each student with a disability a "free appropriate public education" (FAPE). Id. § 1412(a)(1). States, through local educational agencies, achieve this by developing an "individualized education program" (IEP) for each child who has a disability. Id. § 1412(a)(4). The IEP documents the student's current level of achievement, sets annual goals, states how to measure progress, and specifies special education services. See id. § 1414(d)(1)(A). Educators work with the student's parents as part of an "IEP team" to develop the IEP. Id. § 1414(d)(1)(B), (d)(3)(A). At least

annually, that team must review the IEP and revise it as appropriate. Id. § 1414(d)(4).

Additionally, the IDEA establishes procedural safeguards for students and their parents. Id. § 1415. These include the right to an impartial due process hearing if the local educational agency and parents disagree on the appropriate IEP. Id. § 1415(b)(6), (f). After the hearing officer makes a decision, any unsatisfied party may bring a civil action in federal court. Id. § 1415(i)(2). The court then reviews the record, hears additional evidence if requested by either party, and makes a decision as to the appropriateness of the IEP based on the preponderance of the evidence. Id. § 1415(i)(2)(C).

## B.

Appellant O.S. attended public school in Fairfax County for kindergarten and first grade. He has several medical disorders: Doose Syndrome (a seizure disorder), Atrial Septal Defect (a small hole in his heart), and ankyloglossia (a disorder commonly referred to as tongue-tie). Those disorders qualify him for special education under the other health impairment category. For kindergarten and first grade, O.S.'s school developed and revised IEPs for him with his parents' approval.

Under his initial kindergarten IEP, O.S. received special education services during fifteen of the thirty hours in his school week. He received those services in his general

3

education classroom with a special education teacher or instructional assistant working with him on his IEP goals. Additionally, O.S. received two hours each month of occupational therapy in a special education classroom. Later that year, the IEP team added two hours each month of adapted physical education. After a speech evaluation, it also added four hours of speech and language therapy each month, which later increased to six hours each month.

For first grade, the team revised O.S.'s IEP to meet his goals in communication, reading readiness, reading comprehension, writing, writing readiness, mathematics readiness, attending skills, and adapted physical education. O.S. continued receiving six hours each month of speech and language therapy and two hours each month of occupational therapy, but his adapted physical education increased to four hours each month. The team gradually shifted O.S.'s hours away from the general education classroom until ten of his fifteen hours were in the special education classroom.

Over the course of first grade, O.S. missed over thirty full school days, and part of almost twenty additional days. Toward the end of that year, a committee designated by Fairfax County reviewed psychological, sociocultural, and educational evaluations of O.S. to determine if he still qualified for special education. It also reviewed testing results that O.S.'s

4

parents submitted from the Kennedy Krieger Institute, a private institution. The committee included representatives from the Fairfax County School Board (School Board), as well as O.S.'s mother and a family friend. It again found O.S. eligible for special education under the other health impairment category.

For second grade, the IEP team proposed new goals in writing and written language, reading, mathematics, communications, and behavior improvements. In the proposed plan, O.S. would continue to receive two hours each month of occupational therapy and six hours each month of speech and language therapy, both in a special education setting. He would also continue to receive fifteen hours of other special education services, but with more of those hours in his general education classroom. This time, however, O.S.'s parents rejected the school's proposed IEP. The team attempted to address some of their concerns by adding and modifying goals in writing, reading, math, organization, and behavior. But O.S.'s parents also requested a one-on-one aide, extended school year services, and that FCPS assign a full-time nurse to the school. The team did not adopt those requests, and the parents did not agree to the new IEP.

C.

Instead, O.S.'s parents, on his behalf, requested a due process hearing to determine whether the School Board provided

5

him a FAPE. They challenged the adequacy of his education on six grounds: (1) inadequate instruction in reading, math, and writing; (2) inadequate occupational therapy and speech and language services; (3) lack of extended school year services; (4) lack of a one-on-one aide; (5) failure to program for his safety (lack of a full-time nurse); and (6) failure to develop an appropriate IEP for second grade. As evidence that O.S. had not progressed, he pointed to results from the Woodcock-Johnson-Third Edition; the Kaufman Test of Educational Achievement, Second Edition; and the School Board's sociocultural evaluation. Based on those evaluations, O.S. argued that he had actually regressed academically.

After conducting a three-day hearing, in which the hearing officer heard from fourteen witnesses and received over 200 exhibits, the officer issued a detailed written opinion. In that opinion, the officer first recognized that the IEP team had complied with the IDEA's procedural requirements in developing O.S.'s IEPs, and then evaluated the implementation of the IEPs. The officer considered O.S.'s IEPs and progress reports particularly important exhibits and noted that all of the testifying witnesses were "open and honest."

The officer then credited ten witnesses in particular, who were O.S.'s teachers and other educational experts. All testified to O.S.'s progress during kindergarten and first

grade, and explained why each additional accommodation that his parents requested was unnecessary for second grade. While acknowledging that the IDEA does not require parents to present expert testimony, the officer noted that, in contrast to the School Board's showing, O.S.'s parents "offer[ed] virtually no witnesses, other than the parent," to support their position. The hearing officer concluded that the School Board had provided O.S. a FAPE.

O.S. filed a complaint in federal court challenging the decision. Both parties moved for judgment on the administrative record. The district court held that the hearing officer's findings were regularly made, and thus "entitled to some deference." The court then rejected each of O.S.'s challenges, concluding that the School Board did provide a FAPE and affirming the hearing officer's decision. O.S. noted this timely appeal.

## II.

Initially and principally, O.S. argues that the district court applied the wrong standard in evaluating whether he received a FAPE. Specifically, he maintains that in the current version of the IDEA, a FAPE requires "meaningful" rather than "some" educational benefit. Our analysis of the statute is a

7

question of law that we review de novo.  See WLR Foods, Inc. v. Tyson Foods, Inc., 65 F.3d 1172, 1178 (4th Cir. 1995).

Congress first required a FAPE as part of the Education for All Handicapped Children Act of 1975 (EHA).  See Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, sec. 3-4, §§ 601-602, 89 Stat. 773, 775.  Since then, Congress has amended the Act multiple times.  The 1990 amendment renamed the EHA as the IDEA.  See Individuals with Disabilities Act of 1990, Pub. L. No. 101-476, 104 Stat. 1103.  The IDEA, as amended in 2004, remains in effect today.  See Individuals with Disabilities Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 (codified as amended at 20 U.S.C. § 1400 (2012)).  Both the original EHA and the current IDEA require the states to provide a FAPE to students with disabilities.  They define it in almost identical terms.[1]

In Board of Education v. Rowley, 458 U.S. 176 (1982), the Supreme Court provided more content to the FAPE requirement.  In

---

[1]  See 20 U.S.C. § 1401(9) ("The term 'free appropriate public education' means special education and related services that -- (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.").  The EHA used essentially the same definition.  See Pub. L. No. 94-142, § 602(18), 89 Stat. 773, 775.

that case, a deaf first-grade student challenged her IEP because her school refused to provide her an interpreter.  Id. at 184-85.  Although she performed better than many of her peers, she understood "considerably less" than she would have without her disability.  Id. at 185.  She argued that the school did not provide a FAPE because of the disparity between her potential and her achievement.  Id. at 185-86, 198.

The Supreme Court rejected this argument, holding that schools need not "maximize each child's potential."  Id. at 198.  The Court held that a FAPE requires "access" to instruction "individually designed to provide educational benefit."  Id. at 201.  Because that access to education must be "meaningful," id. at 192, schools have to provide "some educational benefit" to fulfill Congress's intent, id. at 200.

Despite various amendments to the IDEA since 1982, we have continued to follow the Rowley definition of a FAPE.  See, e.g., E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 517 (4th Cir. 2014) ("some educational benefit"); Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H., 642 F.3d 478, 484 (4th Cir. 2011) (same); J.H. ex rel. J.D. v. Henrico Cty. Sch. Bd., 395 F.3d 185, 187 (4th Cir. 2005) (same); A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004) (same).

O.S. asks us to find that, in the 1997 and 2004 amendments to the statute, Congress replaced the Rowley standard.  He

9

points to the 2004 congressional findings in the IDEA preamble as evidence that the law now focuses on results rather than mere access. The congressional findings lament "low expectations" of children with disabilities, and state that educating children with disabilities is "more effective" when there are "high expectations" of them "to the maximum extent possible." See 20 U.S.C. § 1400(c) (2012). While the EHA succeeded in providing access to education and improving educational results, id., O.S. argues that the IDEA aimed to go further.

The legislature's shift from requiring access to requiring results does not necessarily establish a shift in the meaning of FAPE from providing "some" benefit to providing "meaningful" benefit. When Congress changes the law on an issue already decided by the Supreme Court, it typically does so explicitly. See, e.g., Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5, 5 (expressly responding to the Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007)); Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, 1488 (expressly responding to the Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990)); cf. Examining Recommendations to Reform FISA Authorities: Hearing Before the H. Comm. on the Judiciary, 113th Cong. 107, 113, 128-29, 153, 171, 191 (2014) (expressly discussing whether Congress should limit the application of

10

<u>Smith v. Maryland</u>, 442 U.S. 735 (1979), given advancements in technology). Congress did not do that with respect to the definition of FAPE.

Rather than articulate a new definition of FAPE, Congress amended the IDEA in other ways. For example, the IDEA now requires that an IEP document "academic achievement and functional performance," rather than educational performance. Pub. L. No. 108-446, § 614(d)(1)(A)(i)(I), 118 Stat. 2647, 2707 (2004). Schools must include students with disabilities in statewide assessments, and now must justify a decision to give a student an alternative assessment. <u>Id.</u> §§ 612(a)(16), 614(d)(1)(A)(i)(VI). Schools must produce progress reports for children with disabilities with the same frequency as they issue regular report cards. <u>Id.</u> § 614(d)(1)(A)(i)(III). Schools must now base special education on peer-reviewed research, to the extent practicable. <u>Id.</u> § 614(d)(1)(A)(i)(IV).

These examples suffice to show that Congress implemented the IDEA's higher expectations in specific ways, and altering the standard for providing a FAPE was not one of them. In fact, the IDEA calls for schools to evaluate a child's "progress," but does so without any quantifier. <u>See, e.g.</u>, 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa) (requiring IEP goals that "enable the child to . . . make progress"). Congress could easily have modified "progress" with "meaningful" if that were its intent.

11

We note that we have never held "some" educational benefit means only "some minimal academic advancement, no matter how trivial." Hall ex rel. Hall v. Vance Cty. Bd. of Educ., 774 F.2d 629, 636 (4th Cir. 1985). Rather, we have used the word "meaningful" to describe what a FAPE requires, even before the 2004 amendments. G. ex rel. R.G. v. Fort Bragg Dependent Schs., 343 F.3d 295, 306 (4th Cir. 2003). But in doing so, we have cited Rowley's "educational benefit" requirement. Id. at 303. Using "meaningful," as the Court also did in Rowley, was simply another way to characterize the requirement that an IEP must provide a child with more than minimal, trivial progress.

O.S. cites cases from some of our sister circuits in support of the view that the IDEA requires "meaningful" educational benefit as distinct from "some" educational benefit. Some courts do explicitly hold that the IDEA as amended requires school districts to meet a heightened standard. See, e.g., N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1212-13 (9th Cir. 2008). Others, although using the word "meaningful," seem to describe the same standard developed in Rowley. See, e.g., D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (holding that Rowley's "some educational benefit" requires "meaningful" as opposed to "trivial" educational benefit). For our part, we are loath to hold, without any express acknowledgment of its intent to do so, that Congress abrogated

12

Supreme Court precedent. We note that recently the Tenth Circuit also rejected a similar contention that a heightened "meaningful benefit" standard had replaced the "some benefit" standard. Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 14-1417, 2015 WL 5011927, at *6-8 (10th Cir. Aug. 25, 2015).

In this circuit, the standard remains the same as it has been for decades: a school provides a FAPE so long as a child receives some educational benefit, meaning a benefit that is more than minimal or trivial, from special instruction and services.

## III.

O.S. maintains, in the alternative, that even if the district court applied the correct standard in evaluating whether he received a FAPE, as we have held it did, the court erred in finding that he had received a FAPE under that standard.

In IDEA cases, a district court conducts "modified de novo review, giving 'due weight' to the underlying administrative proceedings." M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd., 553 F.3d 315, 323 (4th Cir. 2009) (quoting Rowley, 458 U.S. at 206). While the court must make an independent determination on whether the school complied with the IDEA, the hearing officer's

13

factual findings are "considered prima facie correct." E.L., 773 F.3d at 517. "[W]hether or not a program is appropriate" is itself a question of fact. Doyle v. Arlington Cty. Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991). At the request of the parties, a court shall also hear and consider additional evidence. E.L., 773 F.3d at 516-17.

A district court determines whether a school provided a FAPE based on the preponderance of the evidence. Id. It must "afford great deference to the judgment of education professionals in implementing the IDEA," id. at 517, because the IDEA does not allow federal courts "to substitute their own notions of sound educational policy" for those of local school authorities, A.B., 354 F.3d at 325 (quoting Rowley, 458 U.S. at 207). Finally, the party seeking relief bears the burden of proof. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 51 (2005). On appeal, we "apply[] the standard of review utilized by the district court." E.L., 773 F.3d at 517 (quoting M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 531 (4th Cir. 2002)).[2]

For kindergarten and first grade, O.S. challenges the implementation of his IEP rather than specific aspects of it.

---

[2] This court has sometimes stated that we review the district court for clear error. See, e.g., Cty. Sch. Bd. v. Z.P. ex rel. R.P., 399 F.3d 298, 309 & n.7 (4th Cir. 2005) (noting tension in the way we describe the standard of review). We need not resolve that possible tension in this case because the outcome here is the same under both standards.

14

He argues that he did not make sufficient educational progress, and as evidence, he relies on a few evaluations to contend he actually regressed. Those evaluations do measure academic achievement, but, as the district court noted, they are not the only evidence in the record as to the sufficiency of O.S.'s progress. The hearing officer credited numerous IEP progress reports and the testimony of O.S.'s teachers and other education experts that O.S. did progress on many of his individualized objectives.

For example, experts in elementary education, physical education, and speech and language all testified that the IEP was appropriate and that O.S. had made progress. An expert in special education testified that it was "not surprising" O.S. progressed at a slower rate than students without disabilities, but that he was "still making progress." In fact, that same expert said that at the end of the year, O.S. "had made tremendous progress." O.S.'s kindergarten teacher explained that O.S. "definitely" made progress towards his IEP goals, and an expert in occupational therapy noted that O.S. "made very nice progress" over the course of two years. In sum, all of the educators who testified, many of whom qualified as experts, opined that O.S. made progress under the School Board's IEP. Further, addressing his parents' concern that O.S. at times regressed, an expert in special education attributed the

15

regression in part to O.S.'s extensive absences. Even so, the expert did not consider this occasional regression so significant that O.S. could not catch up.

In addition to evaluating O.S.'s progress, the hearing officer considered whether additional accommodations should have been included in O.S.'s second grade IEP. The hearing officer credited unrebutted testimony that a one-on-one aide was only necessary when a student required help with "even the basic needs of the day." The hearing officer found no evidence that O.S. needed that sort of support, and that O.S. already had "teachers and assistan[ts] nearby on a routine basis." And the hearing officer credited an expert in school health who testified that "a nurse is not necessary for the child to be safe in school" because the school already had "protocols in place" to address O.S.'s needs should he have a seizure. Further, because O.S. did not show "significant" regression, the hearing officer found that he did not require extended school year services. The officer noted evidence that O.S. nevertheless could have attended summer school, but that his parents decided not to enroll him in it.

Given that the record supports the hearing officer's findings, we cannot conclude as a matter of law that the School Board did not provide O.S. with a FAPE. To do so would ignore our obligation to give due weight to the hearing officer's

16

findings, and to defer to the judgment of professional educators.[3]

### IV.

We hold that, in evaluating whether a school provides a FAPE, we still look to whether the IEP provides some educational benefit to the student. Here, the district court did not err in finding that the School Board met that requirement. Accordingly, the judgment of the district court is

AFFIRMED.

---

[3] Because the School Board did not fail in its obligation "to provide educational benefit to a disabled student," we reject O.S.'s request for an award of compensatory education. See M.S., 553 F.3d at 325 (discussing compensatory education as a possible remedy for failure to provide a FAPE).