PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1977

M. L., a minor, by his parents and next friends, Akiva and Shani Leiman; AKIVA LEIMAN; SHANI LEIMAN,

                Plaintiffs – Appellants,

      v.

DR. JACK R. SMITH, in his official capacity as Superintendent; MONTGOMERY COUNTY BOARD OF EDUCATION,

                Defendants – Appellees.

------------------------------

NATIONAL JEWISH COMMISSION ON LAW AND PUBLIC POLICY, "COLPA"; MARYLAND CAPE, INC.; JEWELS SCHOOL; MAGEN LEGAL,

                Amici Supporting Appellants,

NATIONAL SCHOOL BOARDS ASSOCIATION; MARYLAND ASSOCIATION OF BOARDS OF EDUCATION; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; AMERICAN CIVIL LIBERTIES UNION; ACLU OF MARYLAND; BAPTIST JOINT COMMITTEE FOR RELIGIOUS LIBERTY; CENTRAL CONFERENCE OF AMERICAN RABBIS; JEWISH SOCIAL POLICY ACTION NETWORK; PEOPLE FOR THE AMERICAN WAY FOUNDATION; UNION FOR REFORM JUDAISM; WOMEN OF REFORM JUDAISM,

                Amici Supporting Appellees.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:14-cv-01679-PWG)

Argued: December 8, 2016                    Decided: August 14. 2017

---

Before NIEMEYER, KING, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge King joined.

---

**ARGUED:** Michael Eig, MICHAEL J. EIG AND ASSOCIATES, P.C., Chevy Chase, Maryland, for Appellants. Jeffrey A. Krew, JEFFREY A. KREW, LLC, Ellicott City, Maryland, for Appellees. **ON BRIEF:** Paula A. Rosenstock, MICHAEL J. EIG AND ASSOCIATES, P.C., Chevy Chase, Maryland, for Appellants. Joshua Civin, Zvi Greismann, Office of the General Counsel, MONTGOMERY COUNTY PUBLIC SCHOOLS, Rockville, Maryland, for Appellees. Nathan Lewin, Alyza D. Lewin, LEWIN & LEWIN, LLP, Washington, D.C.; Meir Katz, MAGEN LEGAL, Baltimore, Maryland, for Amici National Jewish Commission on Law and Public Policy "COLPA", Maryland CAPE, Inc., JEWELS School, and Magen Legal. Leslie Robert Stellman, PESSIN KATZ LAW, P.A., Towson, Maryland; Francisco M. Negrón, Jr., NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, for Amici National School Boards Association and Maryland Association of Boards of Education. Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C.; Jeffrey I. Pasek, COZEN O'CONNOR, Philadelphia, Pennsylvania; Richard B. Katskee, Carmen N. Green, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amici Americans United for Separation of Church and State, American Civil Liberties Union, ACLU of Maryland, Baptist Joint Committee for Religious Liberty, Central Conference of American Rabbis, Jewish Social Policy Action Network, People for the American Way Foundation, Union for Reform Judaism and Women of Reform Judaism.

---

AGEE, Circuit Judge:

M.L., a minor, by and through his parents, Akiva and Shani Leiman, and Akiva and Shani Leiman, individually and in their capacity as M.L.'s parents (collectively, the "Plaintiffs"), appeal the district court's denial of their motion for summary judgment under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and the grant of summary judgment to Dr. Jack Smith,[1] in his official capacity as superintendent of Montgomery County Public Schools, and the Montgomery County Board of Education (collectively, "MCPS"). The district court held that the IDEA does not require a school system to instruct disabled students in the customs and practice of Orthodox Judaism as part of a "free appropriate public education" ("FAPE"). For the reasons stated below, we affirm the judgment of the district court.

I.

The facts are largely undisputed. M.L. was born in 2003 with Down Syndrome and is considered a "child with a disability" under the IDEA. *See* 20 U.S.C. § 1401(3)(A). He and his family are members of the Orthodox Jewish faith and reside in an Orthodox Jewish community in Montgomery County, Maryland. The tenets of Orthodox Judaism include instruction that "[t]he Jewish Bible and Jewish law and custom govern how an Orthodox Jew dresses, eats, prays, works, what holidays are celebrated,

---

[1] The superintendent has changed multiple times throughout the proceedings. Smith is the current superintendent.

and almost every aspect of life, including social interaction and understanding and speaking Hebrew." J.A. 1117.

In 2009, M.L. was enrolled, at his parents' expense, in Sulam, "a special education program that serves the Orthodox Jewish community." J.A. 1117. In 2012, the Plaintiffs and MCPS met to form an individualized education program ("IEP") for M.L. so that he could attend classes in the public school district.[2] After expert assessments of M.L.'s capabilities, MCPS determined that M.L. "is able to learn despite his severe intellectual disability, but he needs constant repetition and consistency." J.A. 1118. After multiple meetings with the Plaintiffs, MCPS created an IEP for M.L. in 2013. The Plaintiffs, however, "rejected the IEP because it does not provide functional instruction to prepare [M.L.] for life in the Orthodox Jewish community." J.A. 1119. Rather, the Plaintiffs wanted the "incorporation of goals and objectives designed to teach [M.L.] about the laws and customs of Orthodox Judaism." J.A. 1119. MCPS rejected this proposal in turn because it was "not part of the curriculum, too specific, religious, or not compatible with [M.L.'s] present levels." J.A. 1119. Shortly thereafter, the Plaintiffs filed a due process complaint against MCPS with the Maryland Office of Administrative Hearings, alleging violations of the IDEA and Maryland state law. *See* 20 U.S.C. § 1415(b)(6), (f) (requiring due process hearings and instructing that those hearings "be conducted by the State educational agency or by the local educational agency, as determined by State

---

[2] The IDEA requires a school to furnish a covered student with a FAPE. It is uncontested that M.L. is a covered student.

4

law"); Md. Code Ann., Educ. § 8-413 (establishing the procedures for due process hearings under Maryland law).

In their request for mediation and a due process hearing, the Plaintiffs maintained that M.L. "has many important cultural needs that must be taken into account when designing an appropriate learning environment for him," and the IEP proposed by MCPS was "not appropriate for his religious and cultural needs." J.A. 836.[3] Although the Plaintiffs conceded that the goal of the MCPS IEP "is to prepare students to live independently in their community," they preferred Sulam because there "this goal is accomplished by preparing students to live independently in their community *within their cultural guidelines*." J.A. 838 (emphasis added). The Plaintiffs stressed that "Orthodox students[, and therefore M.L.,] do not and will not participate in the non-Orthodox community, and the community that MCPS . . . curriculums prepare students for is not the same community [M.L.] will live in." J.A. 838. For example, Sulam instructors lead M.L. in "*davening*, the reciting of Jewish prayers." J.A. 840. Sulam "prepares [M.L.] to participate in the Sabbath or religious holidays, [and] familiarizes him with [the *parsha*,] a particular portion [of the Torah] read [weekly] in Synagogue." J.A. 839–40. The Plaintiffs argued that the IEP proposed by MCPS did "not address the cultural and religious realities of [M.L.'s] life [and] would not prepare him to be functional in his Orthodox community." J.A. 840.

---

[3] Although the Plaintiffs often make "cultural" arguments, at the administrative hearing they presented an expert in Judaism who testified that there is no "significant difference between describing" Orthodox Judaism as a religion or culture. J.A. 174.

5

The parties engaged in an extensive hearing process before a Maryland administrative law judge ("ALJ"). Both sides presented testimonial evidence from several witnesses, including Rabbi Akiva Leiman, M.L.'s father and fellow plaintiff. He testified that all of his children are in "private, religious schools that teach the Orthodox Jewish way of life" because he and his wife "believe that children should be educated for an Orthodox lifestyle and the only place to get that type of education would be in a private, religious school." J.A. 52. The Plaintiffs want M.L. taught about the Torah, kosher rules, and Orthodox Jewish garments (such as the *yarmulke*—"kind of a skullcap, to remind us of God"—and *tzitzit*—"a garment that has fringes at the end, strings that hang out"). J.A. 68–69. They want him instructed, as part of his IEP, in *halacha* (Jewish law) and *mitzvot* ("commandments from God," or things "that the Rabbis have asked [Orthodox Jews] to do over the centuries"). J.A. 82. The Plaintiffs would also require instruction in the *berachot*, which "is a blessing that [Orthodox Jews] make before [they] partake in food and a blessing that [they] make when [they] finish partaking in food." J.A. 87. They believe it is "[e]ssential" for M.L.'s education "that he be able to read Hebrew." J.A. 97. The Plaintiffs demand that MCPS provide this instruction to M.L. as part of his IEP. *E.g.*, J.A. 118 (Rabbi Leiman admitting that he "expect[s] the public school to teach [M.L.] Jewish precepts such as mitzvot and dietary laws").

The Plaintiffs submitted Sulam's 2012–13 Formal Education Plan for M.L. as an exhibit at the administrative hearing. That plan shows the type of curriculum that the Plaintiffs want included in M.L.'s IEP. For example, like the Sulam plan, the Plaintiffs desire the IEP to include lessons in "Judaic Studies," where the goal is to "increase

6

[M.L.'s] understanding of Jewish customs and halacha." J.A. 907. One of the targets of Judaic Studies includes "correctly sequenc[ing] between 3 and 5 events from the parsha" when "[g]iven a previously studied parsha or part of a parsha." J.A. 907. In a class studying the "Chumash," a religious text, Sulam would teach M.L. different parts of the *Chumash*, such as the *parsha*, *perek*, *pasuk*, and *Rashi*. J.A. 908. The Sulam plan also establishes goals for "Ivrit/Kriah" class, or instruction in Hebrew, where objectives include identifying vocabulary words such as those "taken from the current *parsha*" and "us[ing] the correct *Ivrit* word to identify . . . object[s]/explain . . . illustration[s]." J.A. 909.

The ALJ concluded that neither the IDEA nor Maryland law requires a public school to provide religious instruction to disabled students as part of an IEP. According to the ALJ, a FAPE primarily requires that a school provide the disabled student with "access [to] the general curriculum." J.A. 1141; *see also* J.A. 1140 ("Nothing in the IDEA, corresponding State law, or enabling regulations require a state educational agency to individualize an educational program to a disabled child's religion, culture, or community enclave."). Ultimately, the ALJ found the IEP proposed by MCPS provided M.L. with a FAPE under the IDEA. In view of that holding, it was not necessary for the ALJ to address any of the Establishment Clause defenses made by MCPS.

The Plaintiffs then filed a complaint in the United States District Court for the District of Maryland seeking declaratory and injunctive relief under the IDEA and Maryland state law. *See* 20 U.S.C. § 1415(i)(3)(A) ("The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the

7

amount in controversy."). In pertinent part, the Plaintiffs requested that the district court "order[ MCPS] to reimburse plaintiffs for the costs associated with enrolling M.L. at Sulam School for the 2012–13 school year" and also "[o]rder [MCPS] to place and fund M.L. at Sulam School for the 2013–14 school year and declare it to be his current educational placement under the IDEA." J.A. 14. On cross motions for summary judgment, the district court granted the motion by MCPS and denied that of the Plaintiffs.

In its memorandum opinion and order, the district court recognized that "beyond the alleged problematic interplay between the IEP and [M.L.'s] role in his Orthodox community, including the ALJ's failure to account for [M.L.'s] inability to generalize and the consequent (in Plaintiffs' view) failure to place [M.L.] at Sulam, Plaintiffs do not identify any faults in the IEP or the ALJ's review of it." J.A. 43. The court identified "the crux of this dispute: Is the education proposed in the IEP a FAPE when it does not account for [M.L.'s] individual religious and cultural needs?" J.A. 43. Answering that query in the affirmative, the district court held that "a FAPE, to which a child with a disability is entitled, is the education that any student without disabilities would receive." J.A. 43. Outside of their religious and cultural argument, the district court concluded that the Plaintiffs had not shown that the IEP was in any way deficient or treated M.L. in a different way than any other disabled student. Because MCPS provided a FAPE to M.L. under the IDEA, it was unnecessary to reach the Establishment Clause issues that would arise had the Plaintiffs prevailed and placement of M.L. at Sulam resulted.

8

The Plaintiffs filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.[4]

## II.

The Plaintiffs argue that the district court erred in concluding that the IDEA does not require a school to provide religious or cultural instruction to disabled students as part of their IEPs. In other words, the Plaintiffs contend that MCPS failed to provide M.L. with a FAPE in violation of federal and state law, despite their concession that the IEP was adequate in all other respects.[5] We disagree with the Plaintiffs.

## A.

In IDEA cases, we apply "the standard of review utilized by the district court" in reviewing the ALJ's decision: a "modified de novo review, giving due weight to the underlying administrative proceedings." *O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015).[6] "While the court must make an independent determination on whether

---

[4] After oral argument, the Plaintiffs filed a motion to hold the appeal in abeyance pending the Supreme Court's decision in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE–1*, 580 U.S. __, 137 S. Ct. 988 (2017). We granted the motion. After the Supreme Court released its decision, we ordered supplemental briefing on the limited issue of how *Endrew F.* affects the disposition of this case, if at all. The case is now ripe for decision.

[5] While the Plaintiffs largely focus their arguments on the IDEA, they also cite to Maryland statutes and regulations designed to implement the IDEA. *See* Md. Code Ann., Educ. § 8-401 *et seq.*; Md. Code Regs. 13A.05.01.01 *et seq.* These statutes and regulations, however, do not deviate materially from their federal counterparts. *See generally John A. v. Bd. of Educ.*, 929 A.2d 136, 140–43 (Md. 2007) (discussing the requirements of the IDEA and citing to its Maryland counterpart). Thus, the Plaintiffs' arguments under Maryland law fail for the same reasons that their IDEA arguments are unavailing.

[6] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

the school complied with the IDEA, the hearing officer's factual findings are considered prima facie correct." *Id.* The determination of whether an IEP is adequate "is itself a question of fact." *Id.*

B.

1.

Among other purposes, the IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).[7] A FAPE is defined as

> special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

*Id.* § 1401(9). "Special education" is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." *Id.* § 1401(29). The goals of the "specially designed instruction" are "(i) [t]o address the unique needs of the child that result from the child's disability; and (ii) [t]o ensure access of the child to the general

---

[7] Congress provides federal funding to states to implement this goal. *See generally* 20 U.S.C. § 1411(a).

curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. § 300.39(b)(3). A FAPE includes the provision of certain "nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities." *Id.* § 300.107(a).

An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414(d)]." 20 U.S.C. § 1401(14). Among other provisions, the IEP includes "a statement of measurable annual goals, including academic and functional goals, designed to (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability." *Id.* § 1414(d)(1)(A)(i)(II); *see also* 34 C.F.R. § 300.320 (defining IEP). When developing the IEP, the school "shall consider (i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A).

2.

The leading IDEA case is *Board of Education v. Rowley*, 458 U.S. 176 (1982).[8] In that case, the plaintiff was a deaf student who sued the defendant school district after it refused to provide her with a sign-language interpreter in class as part of her IEP. *Id.* at 184–85. The district court held that the child "was not receiving a free appropriate public education, which the court defined as an opportunity to achieve her full potential commensurate with the opportunity provided to other children." *Id.* at 185–86. The Second Circuit affirmed that decision. *Id.* at 186. The Supreme Court granted certiorari to address "[w]hat is meant by the Act's requirement of a free appropriate public education." *Id.* at 186.

The *Rowley* Court began by recognizing that the purpose of the IDEA is "to promote the education of handicapped children, and [that it] was passed in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Id.* at 179. Further, the Court determined that the IDEA defined a FAPE essentially as "consist[ing] of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Id.* at 188–89. Although the Court acknowledged that the definition of

---

[8] The *Rowley* Court analyzed the plaintiff's claims under the Education of the Handicapped Act ("EHA"). Congress later renamed the EHA the IDEA. To prevent confusion, we use "IDEA" in our *Rowley* discussion instead of "EHA."

12

FAPE found in the IDEA "tends toward the cryptic rather than the comprehensive," it nevertheless concluded that the definition "is the principal tool which Congress has given us for parsing the critical phrase of the Act." *Id.* at 188.

The Court also looked to the motive of Congress in enacting the IDEA, understanding it to be the "intent to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt *procedures* which would result in individualized consideration of and instruction for each child." *Id.* at 189. That said, the Court noted that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* The legislative history of the IDEA's enactment likewise did not support an interpretation that, "in seeking to provide [children with disabilities] access to public education, Congress [intended to] impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." *Id.* at 192. Rather, "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.*; *see also id.* at 197 n.21 ("Whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education.").

The Court also held that the term "free appropriate public education" did not mandate "equality" or any requirement that schools provide the same education to students with disabilities as that provided to students without disabilities. *Id.* at 198 ("The requirement that States provide 'equal' educational opportunities would thus seem

to present an entirely unworkable standard requiring impossible measurements and comparisons."). Instead, a school is required only to provide "equal *access*." *Id.* at 200 (emphasis added). Thus, the lower courts in *Rowley* "erred when they held that the Act requires [the State] to maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children." *Id.* Rather, providing a FAPE means "that the education to which access is provided [must] be sufficient to confer some educational benefit upon the handicapped child." *Id.* The Court "conclude[d] that the basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. In sum, a school "satisfies [the FAPE] requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203.

Since *Rowley*, we have consistently held that "a school provides a FAPE so long as a child receives some educational benefit, meaning a benefit that is more than minimal or trivial, from special instruction and services." *O.S.*, 804 F.3d at 360 (stating that, "[i]n this circuit, the standard remains the same as it has been for decades"). After oral argument in this case, however, the Supreme Court heard argument in and decided *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE–1*, 580 U.S. __, 137 S. Ct. 988 (2017), in which the Court rejected the Tenth Circuit's "merely more than *de minimis*" FAPE standard, *id.* at 1000–01. The Supreme Court held that *Rowley*'s "statement that the Act did not guarantee any particular level of education simply reflects the unobjectionable proposition that the IDEA cannot and does not promise any particular

14

educational outcome." *Id.* at 998. Although the Court in *Rowley* had found it "difficult . . . to say when educational benefits are sufficient," that did not mean "that *any* educational benefit was enough." *Id.*

The Court went on to hold that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. This is a "fact-intensive exercise." *Id.* When a child is unable to "fully integrate[] in[to] the regular classroom," as with M.L., the "educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 1000. In sum, the Court found that "[t]he IDEA demands more" than "an educational program providing 'merely more than *de minimis*' progress from year to year." *Id.* at 1001. However, the Court rejected Endrew F.'s argument that "a FAPE is an education that aims to provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities." *Id.*

Our prior FAPE standard is similar to that of the Tenth Circuit, which was overturned by *Endrew F.* We have cited to the Tenth Circuit's standard in the past, including that court's decision in *Endrew F.* itself. *See O.S.*, 804 F.3d at 360 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE–1*, 798 F.3d 1329, 1338–41 (10th Cir. 2015)). For purposes of the case at bar, though, we need not delve into how *Endrew F.* affects our precedent because the IDEA does not provide the remedy the

15

Plaintiffs want, regardless of the standard applied. Moreover, the Plaintiffs never raised any issue about the standard before the ALJ or district court, and it was never at issue on appeal. The Plaintiffs have not identified in post-argument briefing any way in which *Endrew F.* affects the resolution of this case.

3.

Like *Rowley*, "[t]his case presents a question of statutory interpretation." 458 U.S. at 179. In that regard, absent from the IDEA is any requirement that schools provide religious or cultural instruction. The Plaintiffs do not point to any section of the IDEA or its implementing regulations that requires a school to develop a religious or cultural curriculum, such as the Plaintiffs' requested teaching of "blessings [and] Hebrew words." Opening Br. 38; *see also* J.A. 86–87 (Rabbi Leiman's testimony that the school should instruct M.L. in "keeping kosher," "wearing a yarmulke," "observing mitzvot," and "observing Jewish holidays"). The Plaintiffs' requested interpretation of the IDEA necessitates adding requirements not present in the statute: a function for Congress, not the judiciary. *See United States v. Luskin*, 926 F.2d 372, 376 (4th Cir. 1991) (refusing to "legislate from the bench by adding [a] provision" to a statute because "[t]he statute does not contain words to this effect, and this Court does not have the power to make such an amendment"); *see also Henson v. Santander Consumer USA Inc.*, 582 U.S. __, 137 S. Ct. 1718, 1726 (2017) ("[T]he proper role of the judiciary . . . [is] to apply, not amend, the work of the People's representatives."); *Rowley*, 458 U.S. at 190 n.11 ("After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."). In fact, federal regulations support the

16

conclusion that states may *not* use IDEA funds to provide religious and cultural instruction. *See, e.g.*, 34 C.F.R. § 76.532(a)(1) (funding regulation prohibiting a state from "us[ing] its grant or subgrant to pay for . . . [r]eligious worship, instruction, or proselytization"). As the Sixth Circuit stated in an IDEA case, albeit in response to an Establishment Clause argument, "[t]he IDEA certainly has a secular purpose and its primary effect is one that does not advance religion." *Peck ex rel. Peck v. Lansing Sch. Dist.*, 148 F.3d 619, 629 (6th Cir. 1998).

The district court was correct in holding that religious and cultural instruction does not fall within the school's duty to provide a disabled student with access to the general curriculum. Under the IDEA, the school must only address the student's individual needs to the extent it takes to provide that access. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II) (stating that the IEP must include "a statement of measurable annual goals, including academic and functional goals, designed to (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability"). MCPS is not required to "maximize the potential of handicapped children commensurate with the opportunity provided to other children." *Rowley*, 458 U.S. at 189–90.

The Plaintiffs' witnesses, including Rabbi Leiman, agreed that the IEP would be sufficient but for the Plaintiffs' desire for instruction in Orthodox Judaism. For example, Rabbi Leiman acknowledged that "the goals and objectives [of the MCPS IEP] meet [M.L.'s] secular needs." J.A. 111. He also admitted that, "but for his religion [and

17

culture], [MCPS] could meet [M.L.'s] special education and general education needs." J.A. 112. Further, the Plaintiffs concede that they "send [M.L.] to Sulam school in furtherance of [their] religious beliefs." J.A. 102. Their "main objection" to the MCPS IEP is that it "does not address Judaism," and they are concerned that M.L. will be taught "various things that would contravene Jewish law" if he were to attend public school. J.A. 156–57. Thus, the Plaintiffs concede that their only objection to the IEP proposed for M.L. is the absence of religious instruction on M.L.'s cultural preferences.

MCPS offered uncontested evidence that it would make reasonable accommodations for M.L.'s religious preferences. *See* Reply Br. 1 (the Plaintiffs conceding that "[t]his appeal has nothing to do with any allegation that MCPS has failed in its efforts to accommodate M.L.'s religious beliefs and those of his parents"). For example, the Plaintiffs have continually cited their objection to M.L.'s participation in MCPS-sponsored trips to McDonald's "to practice buying and ordering items," Opening Br. 49; *see also* J.A. 75 (testimony of Rabbi Leiman: "McDonald's serves food that is specifically non-kosher and we wouldn't want [M.L.] to be there, certainly not to purchase there, and obviously not to eat there."), but MCPS does not "require children to participate in things that go against their cultural beliefs." J.A. 612. Another example is that, for children, like M.L., whose parents find the celebration of Halloween "very offensive . . . and strongly against their religious beliefs, . . . those children rather than participating in the party and the parade, participate[] in a story time in the library." J.A. 560. MCPS accommodates "students who maintain a kosher diet." J.A. 604. Even

more, the school "provide[s] opportunities to practice certain prayers" as well as "places for students to come and have their prayers if they need be." J.A. 613.

The Plaintiffs also contend that the district court and ALJ erroneously disregarded their argument that an IEP must allow M.L. "to generalize what he learns from one setting to another." Opening Br. 44.[9] However, the Plaintiffs do not truly argue that the IEP fails to generalize M.L.'s education across the school and home settings. Instead, they contend that the religious instruction he receives at home should be generalized to the school setting. Again, however, the IDEA does not mandate that a school instruct a student in his preferred religious practices. Rabbi Leiman essentially conceded this point when he testified that he and his family "believe that children should be educated for an Orthodox lifestyle and the only place to get that type of education would be in a private, religious school"—not just for M.L., but all of the Leiman children. J.A. 51–52. Because the IDEA does not require a school to provide religious and cultural instruction inside the schoolhouse gates, it likewise does not contemplate how a student may absorb such instruction at home.

Finally, the Plaintiffs cite to the requirement that an IEP include "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet

---

[9] As MCPS points out, the Eleventh Circuit has held that a school need not necessarily consider a student's ability to generalize skills between school and home to find an IEP adequate. *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1293 (11th Cir. 2001) (holding that "generalization across settings is not required to show an educational benefit"). It is unnecessary for us to decide today whether to adopt that holding, as the Plaintiffs do not contest that the IEP does instruct M.L. on generalizing among settings, except when it comes to religious practice. As we explain at several places herein, that type of instruction is not required by the IDEA for a FAPE.

19

each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb). They argue that, "to the extent that M.L.'s religious and cultural needs resulting from his inability to generalize skills across settings do not fall within his progress in the general education curriculum, they are squarely within the context of the statute's 'other educational needs' section." Opening Br. 34. According to the Plaintiffs, these "other educational needs" include "[l]earning Hebrew, recognizing kosher signs and impurities in foods, and telling time according to [M.L.'s] dietary restrictions." Opening Br. 34.[10] Assuming for the sake of argument that the Plaintiffs are correct that these "other educational needs" are much broader than the needs of the child "to be involved in and make progress in the general education curriculum," 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa), the IEP did appropriately address those other needs. For example, the MCPS IEP provided for instruction in areas not specifically part of the general curriculum, such as learning to tell time, fine motor coordination, identification of community and safety signs, and cognizance of currency. M.L. would also be taught how to interact when participating in a community experience. These non-general education curriculum activities would be the same as for any other disabled child with similar disabilities. The IEP also set goals for M.L. outside the general curriculum in behavioral, speech and language, and occupational therapy. Just like the needs in

---

[10] By way of explanation, according to Rabbi Leiman, the Plaintiffs do not "eat milk and meat together." J.A. 79. If M.L. eats a "milky meal," he must wait five hours before eating a "meaty meal," and vice versa, so he must be taught how to calculate those religious increments as part of his faith practice. J.A. 79. M.L. must learn how to identify "blood spots" in eggs because Orthodox Jewish law forbids the consumption of eggs with those spots. J.A. 76. M.L. must also learn to recognize "dozens of kosher symbols"—perhaps even "over a thousand." J.A. 62, 237.

§ 1414(d)(1)(A)(i)(II)(aa), these "other educational needs" do not include any religious or cultural instruction, nor are they required by the IDEA.

The Plaintiffs erroneously read "other educational needs" as "*all* other educational needs." But the IDEA does not require a public school to account for every deficiency a disabled student might possess, just like a school does not have to exhaust its resources to enable a nondisabled student to achieve his ultimate potential. *See Rowley*, 458 U.S. at 199 (concluding that the IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential"). Rather, the school must only "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. The relevant circumstance here is that M.L. is disabled, not that he is of the Orthodox Jewish faith. As the Supreme Court reaffirmed in *Endrew F.*, "the IDEA cannot and does not promise any particular educational outcome," *id.* at 998, and it does not require one that furthers a student's practice of his religion of choice.

MCPS provided M.L. with equal access to an education, on the same basis as it provides to all other students with disabilities. It does not provide religious and cultural instruction to its students with or without disabilities and has no duty under the IDEA to administer such instruction to M.L. Thus, because the proposed IEP provided M.L. with

a FAPE, it meets the requirements of the IDEA. The district court did not err in so finding and awarding summary judgment to MCPS.[11]

## III.

For all of these reasons, the judgment of the district court is

*AFFIRMED*.

---

[11] The district court concluded that it was unnecessary to decide whether MCPS would violate the Establishment Clause by paying for M.L.'s private education. A public school is not required to pay for a student's placement in private school if the public school "made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i); *see also* 34 C.F.R. § 300.148(a). A court may order the public school to pay the private school tuition only if it finds the public school did not provide the student with a FAPE. 20 U.S.C. § 1412(a)(10)(C)(ii); *see also* 34 C.F.R. § 300.148(c). Once the district court determined that MCPS provided M.L. with a FAPE, the inquiry ended. Thus, any question of whether publicly-funded private tuition in this case would violate the Establishment Clause would be speculative and purely advisory. Therefore, that issue is moot.

Finally, we do not reach the Free Exercise Clause arguments raised by amici and addressed by MCPS and the Plaintiffs in their response and reply briefs, respectively. The Plaintiffs did not raise a Free Exercise argument in their opening brief. Because the Court generally does not consider arguments raised in amicus or reply briefs in the first instance, we do not reach those arguments here. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 248–49 (4th Cir. 2013) (reply briefs); *Snyder v. Phelps*, 580 F.3d 206, 216–17 (4th Cir. 2009) (amicus briefs).